**Donald M. PARADIS, Petitioner,**

v.

**A.J. ARAVE, Warden, Idaho State Correction Institution, and Al Murphy, Director, Idaho State Board of Corrections, Respondents.**

**Civ. No. 86–1188.**

United States District Court,
D. Idaho.

July 30, 1987.

As Corrected Aug. 24, 1987.

---

William L. Mauk, Skinner, Fawcett & Mauk, Bruce S. Bistline, Boise, Idaho, Edwin S. Matthews, Jr., Charles Wolfson, Coudert Brothers, New York City, for petitioner.

Jim Jones, Atty. Gen.; State of Idaho, Lynn E. Thomas, Sol. Gen., Office of Atty. Gen., State of Idaho, Boise, Idaho, for respondents.

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

RYAN, District Judge.

### I. INTRODUCTION

This action is a petition for writ of habeas corpus filed June 9, 1986, pursuant to 28 U.S.C. § 2254. Judgment of conviction was entered after jury trial by the District Court of the First Judicial District of the State of Idaho, in and for the County of Kootenai, Coeur d'Alene, Idaho, on December 10, 1981. Petitioner was sentenced to death on April 7, 1982.

On June 10, 1986, the court entered a Memorandum Opinion and Order finding that summary dismissal pursuant to Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts was not appropriate. The court analyzed the law relative to petitioner's application for stay of execution of sentence of death and determined that a stay of execution should be granted. The court entered an order for stay of execution of death sentence pursuant to 28 U.S.C. § 2251. The respondents were ordered to file an answer to the petition.

On July 2, 1986, respondents filed their answer, together with transcripts listed as Exhibits A through H (hereinafter "Tr.A–H"). Additionally, affidavits designated as Exhibits I through N (hereinafter "Exh. I–N") were provided to the court.

Until November 10, 1986, petitioner was represented by Edwin S. Matthews, Jr. On November 10, 1986, upon motion by petitioner, the court granted leave to proceed in forma pauperis and appointed local attorneys William L. Mauk and Bruce S. Bistline as counsel for the petitioner pursuant to 18 U.S.C. § 3006A. It was understood that Mauk would be involved primarily at the hearing stage of the proceedings. Bistline provided logistical and procedural assistance. Bistline conducted the discovery allowed by the court. Matthews continued

to represent petitioner primarily in legal research and brief preparation. The above-mentioned counsel represented petitioner through the discovery, hearing and post-hearing briefing phases of this proceeding.

On November 10, 1986, the court ordered petitioner to file on or before December 19, 1986, an initial brief relative to the issues raised in the petition, and respondent to file a responsive brief on or before January 13, 1987. Upon motion by petitioner, the court ordered on January 8, 1987, that petitioner's initial brief be filed on or before February 13, 1987, and respondents' brief on or before March 13, 1987. The court informed the parties that any evidentiary hearing would be conducted by the court beginning April 6, 1987.

A primary purpose for ordering initial briefing was to allow the parties the opportunity to address the issue of the right to an evidentiary hearing and the scope of such hearing given the issues raised by the petition. Secondarily, the initial briefing provided the court with an outline of the law relative to the issues which petitioner sought to address by an evidentiary hearing. The parties filed simultaneous briefs on March 6, 1987, and simultaneous reply briefs on March 20, 1987. On March 20, 1987, the court granted petitioner's motion regarding the evidentiary hearing. Petitioner had requested the opportunity to submit evidence on five issues raised in the petition. The court reiterated that the hearing would be conducted beginning on April 6, 1987, and that three days had been set aside from the court's calendar for the hearing.

It should be noted that this court addressed numerous requests for discovery and appointment of expert witnesses, which were granted in part and denied in part. The record adequately reflects the process of discovery in this action. The court attempted to strike a balance between allowing discovery necessary for presentation of the issues raised in the petition and prohibiting discovery which could serve little purpose other than in retrying the matter. The court granted petitioner the right to have various witnesses subpoenaed and paid their witness fees at government expense and denied some such requests. Numerous depositions were conducted, documents produced and witnesses made available. The court also ordered the testing of various items of evidence which were related to the underlying crime.

The court conducted an evidentiary hearing in this matter on the 6th, 7th, 8th, 13th, 14th and 15th of April, 1987. The court recognized the urgency and importance of this matter and cleared the court's calendar to provide counsel every opportunity to present all of the evidence reasonably necessary. The matter was taken under advisement pending submission of post-hearing memoranda. The record before this court is complete and the court will herein enter the court's findings of fact, conclusions of law and final disposition of the petition for writ of habeas corpus.

## II. PROCEDURAL DEFAULT

The State of Idaho has claimed that the issues raised in the petition for writ of habeas corpus regarding the trial court's denial of petitioner's motion for change of venue and the conduct and statements made by the prosecutor have been procedurally defaulted and should not be considered by this court. The State has also asserted that petitioner's claim of denial of an impartial sentencing authority has been procedurally defaulted. However, while perhaps the issue was not expressly raised in the direct appeal by Paradis, the question is necessarily reviewed pursuant to the Idaho Supreme Court's duty found in Idaho Code § 19–2827. The Idaho Supreme Court engaged in an independent review of this case pursuant to Idaho Code § 19–2827 in *State v. Paradis*, 106 Idaho 117, 676 P.2d 31 (1983), *rehr'g denied*, February 14, 1984. This court considers the issue of the impartiality of the sentencing authority to have been decided on direct appeal to the Idaho Supreme Court and the issue will be reexamined by this court below.

In *Paradis v. State of Idaho*, 110 Idaho 534, 716 P.2d 1306 (1986), *rehr'g denied* April 30, 1986, the court found that peti-

tioner's claims regarding change of venue and prosecutorial misconduct had been procedurally defaulted and, therefore, rejected as a matter of law. At that time the matter was before the Idaho Supreme Court for appellate review of the decision on the petition for post-conviction relief. The Idaho Supreme Court correctly cited the rule in Idaho that issues which could have and should have been raised on direct appeal will not be allowed to be raised in a post-conviction proceeding. The reason for the rule is that post-conviction proceedings cannot be used as a substitute for appeal. *Id.* 110 Idaho at 545, 716 P.2d 1306; *Watkins v. State*, 101 Idaho 758, 620 P.2d 792 (1980).

Petitioner challenges the finding of procedural default by asserting that Idaho has established a recognized exception to the procedural rules for the consideration of constitutional claims in capital cases, citing *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981). Petitioner avers that the existence of such an exception in capital cases eviscerates the rule with respect to the request for relief in this federal action. However, the *Osborn* court was dealing with its requirements under Idaho Code § 19–2827 to review the whole record as it pertains to the death sentence. In a sense, Idaho Code § 19–2827 as construed by the *Osborn* court does create a limited exception to the procedural default rule with respect only to the procedures employed in sentencing and the ultimate sentence of death. In other words, there can be no procedural default of issues arising from the sentence of death by a failure to interpose objection at the trial level.

■ The Idaho Supreme Court has the affirmative duty to review the entire record regarding sentencing for both asserted and unasserted errors. In this case, the Idaho Supreme Court did review the record regarding sentencing pursuant to Idaho Code § 19–2827 and any issue arising from sentencing must therefore be considered to have been decided upon direct appeal by the Idaho Supreme Court. The rule announced in the *Osborn* case does not extend to every issue which may or may not arise as to pretrial and trial proceedings, but only applies to the sentencing procedure and death sentence. There is no general exception to the procedural default rule in capital cases.

■ Petitioner's second claim is that the procedural default rule has been irregularly and sporadically applied, and therefore, the rule should not preclude federal review. The court has reviewed the cases cited by the petitioner for this proposition as well as other case law from the State of Idaho and has determined that petitioner has failed to show that the rule should not be applied in this federal review because of some irregular and sporadic application by the state courts.

■ Petitioner's next challenge to the procedural default is that "Idaho law provides that claims are waived for purposes of post-conviction relief *only* if they were 'knowingly, voluntarily and intelligently waived.' Idaho Code § 19–4908." Petitioner's Memorandum Response to Respondent's Memorandum Dated March 6, 1987, filed March 20, 1987, at 18–19 (emphasis added). Petitioner misstates Idaho Code § 19–4908 (1979) which states:

> Waiver of or failure to assert claims.— All grounds for relief available to an applicant under this act must be raised in his original, supplemental or amended application. Any ground finally adjudicated *or not so raised, or* knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief may not be the basis for a subsequent application, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the original, supplemental, or amended application. (emphasis added)

Clearly, the emphasized portion of the statute as quoted above is written in the disjunctive and the knowing, voluntary and intelligent waiver is not the "only" method of waiver. The issues of venue and prosecutorial misconduct were "not so raised" in the original, supplemental or amended application.

Petitioner next requests that this court disregard the procedural default. In *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), the Court stated:

> [W]e hold that counsel's failure to raise a *particular* claim or claims on appeal is to be scrutinized under the cause and prejudice standard when that failure is treated as a procedural default by the state courts. Attorney error short of ineffective assistance of counsel does not constitute cause for a procedural default even when that default occurs on appeal rather than at trial. To the contrary, cause for a procedural default on appeal ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the claim.

*Id.* 477 U.S. at ——, 106 S.Ct. at 2648, 91 L.Ed.2d at 411. *See also, Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The Ninth Circuit has embraced the doctrine of procedural default. *Allen v. Risley*, 817 F.2d 68 (9th Cir.1987). This court must review petitioner's allegations regarding cause and prejudice in order to determine whether the procedural default of the venue and prosecutorial misconduct issues should be set aside.

In *Murray*, the Court adhered to the view that the cause and prejudice test "in the conjunctive" must be met. *Murray v. Carrier*, 477 U.S. at ——, 106 S.Ct. at 2650, 91 L.Ed.2d at 414. The court took the opportunity to discuss some elements of cause and prejudice:

> We think, then, that the question of cause for a procedural default does not turn on whether counsel erred or on the kind of error counsel may have made. So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington, supra*, we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default. Instead, we think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can

show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule....

> Similarly, if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State, which may not "conduc[t] trials at which persons who face incarceration must defend themselves without adequate legal assistance." *Cuyler v. Sullivan*, 446 U.S. 335, 344, 64 L.Ed.2d 333, 100 S.Ct. 1708 [1716] (1980). Ineffective assistance of counsel, then, is cause for a procedural default.

*Id.* 477 U.S. at ——, 106 S.Ct. at 2645–46, 91 L.Ed.2d at 408.

The habeas petitioner must show "not merely that the errors at ... trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." [*United States v.*] *Frady*, [456 U.S. 152,] 170, 17 [71] L.Ed.2d 816, 102 S.Ct. 1584 [1596]. Such a showing of pervasive actual prejudice can hardly be thought to constitute anything other than a showing that the prisoner was denied "fundamental fairness" at trial.

*Id.* 477 U.S. at ——, 106 S.Ct. at 2649, 91 L.Ed.2d at 412.

The asserted cause in this case as to both venue and prosecutorial misconduct is ineffective assistance of counsel. The alleged prejudice is denial of a fair and impartial jury and the improper injection of passion and emotion into the decision-making of the jury by improper statements.

## A. Venue

The seminal case in the area of assistance of counsel is *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The *Strickland* Court held:

> The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process

that the trial cannot be relied on as having produced a just result.

*Id.* 466 U.S. at 686, 104 S.Ct. at 2064.

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the sixth amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

As all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of reasonably effective assistance.

*Id.* at 687, 104 S.Ct. at 2064.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.... Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* at 689, 104 S.Ct. at 2065 (citations omitted.)

*Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), sets forth the standards regarding the due process rights to a panel of impartial jurors.

In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process.

*Id.* 366 U.S. at 722, 81 S.Ct. at 1642.

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.* at 722–23, 81 S.Ct. at 1642–43. While there may be cases in which pretrial publicity and other indicia of prejudice in the community so pervade and saturate the community as to render virtually impossible a fair trial, demanding a change of venue, *Coleman v. Kemp,* 778 F.2d 1487 (11th Cir.1985), the telling factor with respect to venue questions is whether in the totality of the existing circumstances juror exposure to pretrial publicity results in a trial that is not fundamentally fair. *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

On January 23, 1981, petitioner's attorney at that time, Frederick G. Loats, filed a motion for change of venue on the grounds of excessive pretrial publicity. Tr. A–151. On October 29, 1981, petitioner's attorney, William V. Brown, filed with the First Judicial District Court a motion for change of venue. Tr. A–319. The motion cites pretrial publicity and general motorcycle gang animus as being sufficient grounds to change venue. Request was made that the court move the trial from Kootenai County to Latah County. Attached to the motion were the results of an informal survey conducted at the direction of Brown of individuals in both Kootenai and Latah Counties. Tr. A–322. Also attached to the motion were various newspaper articles,

many of which are found in petitioner's Exhibit No. 4 from the hearing this court conducted in this matter. Tr. A–324. Affidavits from Brown, Paradis and Investigator Joseph F. Daly are also attached to the motion. Tr. A–350–54.

On November 23, 1981, Judge Haman conducted a hearing regarding the motion for change of venue. Tr. A–361. The hearing on motion for change of venue has been transcribed and is found at Tr. B–1–34.

Contrary to petitioner's current claim, the motion for change of venue was very adequately documented and presented to the trial court. No less than thirty-nine newspaper articles were presented in support of the motion for change of venue. These articles comprise a large part of petitioner's Exhibit 4. These newspaper articles, as well as petitioner's Exhibit 4, are largely factual in nature. *See Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). The informal survey was not intended to be as scientific as a Harris Poll, but was designed to alert the trial court to the extent of the pretrial publicity. Again, contrary to petitioner's current assertion, this survey was intended to show the extent of not only print media exposure to this case, but also radio and television publicity regarding the matter. The court finds no basis for a claim of ineffective assistance of counsel regarding the raising and supporting of the motion for change of venue.

Judge Haman issued his decision regarding the motion for change of venue on November 25, 1981. Tr. A–362. Judge Haman acknowledged that under certain circumstances there may be a case where the shocking and sensational nature of the crime and commensurate degree of publicity would require, without more, a change of venue. Tr. A–364. However, Judge Haman stated that he was aware, in his own experience, of cases tried in Kootenai County in the recent past which were at least as "shocking or sensational" as the instant matter. Tr. A–364. Judge Haman also noted, as this court has, that the newspaper articles were basically straightforward, objective and factual in nature. Tr. A–366. Judge Haman found that in cases where pretrial publicity alone does not demand a change of venue, the most common-sense procedure is to at least attempt to seat an impartial jury. If the attempt to secure and seat a fair and impartial jury cannot be completed, then a renewed motion for change of venue would be granted. Petitioner's motion for change of venue was denied without prejudice to the right to renew the motion if warranted. Tr. A–367.

This court must, then, review the voir dire proceedings as they relate to the effectiveness of counsel regarding the support for the motion for change of venue and any claim of prejudice regarding jury bias. The court has thoroughly read the entire voir dire transcript which includes the exercise of challenges. Petitioner's Exhibit 51. The court's review of the voir dire conducted in this matter is attached as APPENDIX I and incorporated herein as if fully set forth.

■ The extensive analysis of the voir dire transcript being completed, this court need not belabor the matter at further length. The court finds petitioner's counsel to have raised the issue of venue, supported the motion for change of venue, and conducted voir dire proceedings and jury selection in an exemplary, professional and competent manner. The court finds no cause to disregard procedural default. At this point, the court will further find that the allegations contained in paragraph 67 and its subparts, and the allegations contained in paragraph 69 regarding change of venue and voir dire transcripts, of the petition for writ of habeas corpus, are not supported by the record and do not support a claim for ineffective assistance of counsel. To the extent the petition is based upon those claims, it is denied.

■ Petitioner has also failed to show prejudice, the second step in the standard for setting aside a procedural default. It is abundantly clear from the voir dire transcript that the general community was not saturated by the media with recountings of the events underlying this matter. Those

veniremen and eventual jurors who had read something of or heard something about the case suggested that their exposure was more or less in passing and without depth. Furthermore, as Judge Haman indicated (Tr. A–366), the articles and news items were not inflammatory and were presented in a straightforward factual manner. Certainly, the extent of media coverage of this case was not so great as to demand change of venue per se.

Petitioner's assertion that the general community was inflamed with an anti-biker animus is unsupported. To the extent, as intimated by Justice Bistline in his dissent in *State v. Paradis,* 106 Idaho at 133, 676 P.2d 31, that few people have much regard for motorcycle gangs, it certainly is not limited to Kootenai County, Idaho. The majority of the veniremen who were questioned were specifically asked whether they had any problem with the defendant being a member of a motorcycle club, to which they each answered, without exception, that it was not a concern or problem. This is telling evidence against petitioner's claim of general biker animus in the community. That certain jury members were not specifically asked about their feeling toward bikers does not suggest ineffective counsel, nor may it be assumed that those persons hid such feelings. To assume so would be contrary to the record at hand. The allegation that one juror told a reporter that another juror held a bias against bikers warrants no inquiry and does not materially affect the venue analysis. The same is true with respect to the showing of the movie "Gimme Shelter."

The jury which was seated to render a decision in this case was, as far as the entire record reflects, a fair and impartial jury. The demands of due process are amply met under the circumstances. Judge Haman made the correct decision in viewing the request for change of venue from the standpoint of whether or not an impartial jury could actually be seated. Once voir dire was completed and preemptory challenges exhausted, it is clear from the record that a fair and impartial jury could be and was seated, therefore abrogating any necessity for change of venue.

In fact, it does not appear that Brown even found it necessary to renew the motion for change of venue. Subsection F of the petition for writ of habeas corpus entitled "Pretrial Publicity and Change of Venue," encompassing paragraphs 81 through 88, is unsupported by the record, is procedurally defaulted, cannot be reopened through the cause and prejudice standard, and is denied.

■ The claim that Brown rendered ineffective assistance of counsel in failing to raise the venue issue on appeal fails. Brown commented at the hearing that he felt constrained to raise to the Idaho Supreme Court only those issues that he felt had the most chance of success on appeal. Brown obviously felt the change of venue issue was not supported by the record and, therefore, did not merit appeal. From this court's review of the record (see APPENDIX I), Brown was correct. Brown neither rendered deficient assistance nor prejudiced his client by failing to raise the issue of venue upon appeal.

Since this court has extensively analyzed the venue question in this matter, the court is comfortable in holding that even without the limitations of the cause and prejudice test necessary to disregard the procedural default, upon independent review there is no constitutional violation regarding the venue question in this matter. Further, effective assistance of counsel is clear from the record. To reiterate, the petition for writ of habeas corpus, to the extent it relies upon the allegations in paragraphs 66(b), 67(a) through (e), 69(a) (regarding venue), 69(c), and 81 through 88, is unsupported by the record as outlined above and to that extent the petition is denied.

### B. Prosecutorial Misconduct

Petitioner has alleged that the prosecutor made misleading, inflammatory and prejudicial statements before trial and during his closing argument which deprived petitioner of a fair trial, in violation of the fifth, sixth and fourteenth amendments to the United States Constitution. In conjunction with the allegation, petitioner has al-

leged that Brown rendered ineffective assistance of counsel in failing to object to various portions of the prosecutor's closing summation and in failing to raise the issue on appeal. The Idaho Supreme Court in *Paradis v. State*, 110 Idaho 534, 716 P.2d 1306 (1986), found that the issue of prosecutorial misconduct had been procedurally defaulted.

As with the issue of venue, this court must analyze the issue of prosecutorial misconduct under the cause and prejudice standard set forth in *Murray v. Carrier*, 477 U.S. at ——, 106 S.Ct. at 2650, 91 L.Ed.2d at 414. The asserted cause is ineffective assistance of counsel and the alleged prejudice is denial of a fair trial.

Under the *Strickland* standard, a defendant must show ineffective assistance of counsel by, first, deficient performance and, second, prejudice. *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. at 2064. The errors made in performance must be so serious that counsel was not functioning as "counsel" and petitioner was deprived of a fair trial, a trial whose result is reliable. *Id.* at 686, 104 S.Ct. at 2063-64. With respect to the failure to object to the prosecutor's statements before and during trial, only those statements which could render the defendant's trial fundamentally unfair, so as to deny due process, which were not objected to, could raise the specter of ineffective assistance of counsel. *See Darden v. Wainwright*, 477 U.S. 187, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). The *Darden* Court stated that the relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Id.* 477 U.S. at ——, 106 S.Ct. at 2472, 91 L.Ed.2d at 157. The standard closely parallels the ineffective assistance of counsel standard in that there must be some reasonable probability that the result of the trial would have been different but for the errors. *Id.* at ——, 106 S.Ct. at 2473-74, 91 L.Ed.2d at 159. In *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the Court stated:

Nevertheless, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.

*Id.* at 11, 105 S.Ct. at 1044. The *Young* Court reviewed the doctrine of invited response.

■ In his opening statement, defense counsel characterized the defendant as having been a Bible College student and having attended church on Sundays. Tr. E-485. In closing summation, the prosecutor stated that there was no evidence that defendant was a church-going person; that if he had been a Bible College student, he had failed to read Chapter 20 of Exodus, which states that thou shalt not kill, commit adultery or bear false witness. These things, the prosecutor said, had been shown at trial. Tr. F-683-84. Of course, the entire trial was to show that defendant had killed another human being. With respect to any charge of adultery, defendant's witness Aera Beaver stated that the defendant had spent the night with her. Tr. E-536-38. As to bearing false witness, the court is unaware of evidence in the record which would support the assertion. Petitioner also complains about the prosecutor's question to the jury about when the last time was they "picked up a broad" and frolicked all night with her. Tr. F-684. This is, obviously, the prosecutor's characterization of Aera Beaver's testimony. Tr. E-536-38. As noted, these statements were in reference to statements made by the defense counsel in opening remarks as to the gentle nature of the defendant. The prosecutor's remarks are his characterization of the evidence, which he has every right to do although the general tenor appears somewhat excessive. Furthermore, during opening instructions, the court explained to the jury:

While it is the duty and right of counsel to address you and explain and elucidate the testimony to better enable you to understand the question which you are to decide, yet, if counsel or any or either of them, inadvertently misstate the evi-

dence, you are to follow the evidence and not the statements of counsel in arriving at your verdict.

Tr. B–14.

■ Next, the petitioner takes exception to the prosecutor's remarks regarding the credibility of defendant's witness, Aera Beaver. The prosecutor characterized Beaver's testimony as a baldfaced lie. Tr. F–688. The prosecutor went overboard in stating that while Beaver characterized herself as a professional mother, the prosecutor would never use the term "mother" to describe her, though she may be a professional of some sort or another. Tr. F–686. The prosecutor's attack on Beaver was unfounded, but in the context of his full discussion regarding Beaver's testimony, its import was miniscule. The prosecutor stated that Beaver took cues from the defendant while on the stand. Tr. F–686. Whether she did so or not does not appear in the record and the jury certainly had the full opportunity to view such conduct, if in fact it happened. The prosecutor stated that perhaps he had been a little bit harsh on Aera Beaver, but that she had lied from the witness stand. Tr. F–687–88. Thereafter, to the prosecutor's credit, he told the jury that they were the sole judges of the credibility of the witnesses and that they should, in essence, conduct their own evaluation of the witness through the witness's demeanor, interest in the case, reasonableness, and corroboration. Tr. F–688. Just prior to that statement, the prosecutor had reviewed certain evidence tending to discredit Beaver. Tr. F–687. The prosecutor's statements regarding Beaver, while somewhat impassioned, appear neither improper nor prejudicial.

■ Next, petitioner states that the prosecutor made personal attacks upon defense counsel. Such practice was condemned in *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). However, this court can find no real evidence from the record that the prosecutor attempted to insult or demean the defense counsel before the jury. The prosecutor did characterize the defense as "a smoke-screen" (Tr. F–689), but such characterization is not improper.

The prosecutor, in reviewing certain medical evidence, commented that Palmer had been placed in a body bag and transported on her back to the site of the autopsy. Tr. F–703. The officers that transported the bodies did not, as far as this court can discern, directly testify as to whether or not the bodies were transported on their backs. The prosecutor posed to Dr. Brady the hypothetical question in which he asked whether redistribution of water in the lungs would occur if the water had been aspirated and the body were removed and transported on its back for a period of several hours. Tr. F–651. On cross-examination, Brown asked Brady about the redistribution of liquid in the lungs if a person were lying on her back. Tr. F–654–55. The issue was certainly discussed, although no direct evidence was presented regarding whether the bodies were transported on their backs. Even if the prosecutor's statement could be characterized as a misstatement of the evidence, the court's preliminary instruction quoted above directs the jury to make their own findings. The same is true with respect to the prosecutor's statement to the effect that there was no evidence to connect Palmer's death to Spokane. Tr. F–706. Furthermore, that statement was made after a lengthy review of the evidence which the prosecutor sought to highlight. Tr. F–704–06.

In his closing statement, Brown told the jury that he believed them when they answered individual questions on voir dire regarding their duties as jurors in this case. Brown asked the jurors to live up to their oath. Tr. F–715–16. Brown stated that the jury should have a clear conscience when it was discharged and the jurors went home and went to bed. Tr. F–714–15. In closing rebuttal, the prosecutor stated:

> Yes, when you go home tonight, when you go home tonight, you should go home with a feeling of having done your duty, and you should also go home knowing that there is law enforcement in your community to protect you. You have a right to that. Our Constitution forbids

retrial of a person for the crime that he has already been tried for. There is no other jury, no other place, no other time that can do your job now. There is no other person that can do your job now. The President of the United States can't do your job now. It is now your responsibility, ladies and gentlemen, I ask you to come back into court with a verdict of guilty of murder in the first degree. Thank you.

Tr. F–718–19.

■ Petitioner argues that the inference from the above-quoted comment made by the prosecutor is that if the jury believed the petitioner was guilty of murdering Palmer, but in Washington and not Idaho, he could not be retried in Washington for the crime if they acquitted him. Petitioner's assertion assumes that the jury would engage in misconduct and disregard the instructions of the court. As noted in the Appendix, the jurors indicated on voir dire that they would respect the instructions of the court. Judge Haman, in outlining the elements of the crime which must be proved beyond a reasonable doubt, indicated that the second element was "that the acts occurred in Kootenai County, State of Idaho." Tr. F–679. It is clear from the reading of the transcript of the trial that the jury was quite well aware that one of the major issues was the place of the death of Kimberly Palmer. *See e.g.* Tr. E–488, Tr. F–707, Tr. F–696. Even if the prosecutor's statement that no other jury could try the matter anew was incorrect, barring double jeopardy, the court can find no inference of prejudice or materiality.

The court finds that petitioner's assertion that the prosecutor, through the statement regarding his place in the chain of justice, does not express a personal opinion nor place his personal integrity behind the State's case. Tr. F–718. As reviewed through the question of venue and voir dire, statements made by the prosecutor prior to trial which were reported in the press have neither been shown to have been read by any members of the jury, nor any more substantial than the number of other articles found in the newspapers in the area. The fact that the prosecutor was an official in his particular church and that jurors were members of the same faith is irrelevant to any issue raised in this case, especially when viewed through the voir dire transcript.

The statements made by the prosecution in reference to the Currier murder will be discussed below.

It should be noted that Brown was certainly aware that he had the right to object to the prosecutor's closing statement if it reached the bounds of impropriety, as the prosecutor objected to Brown's opening statement. Tr. E–486, 489. As the court has outlined above, while certain comments made by the prosecutor were overzealous, there was no impropriety of constitutional dimensions and no demonstration of prejudice. Brown cannot be said to have rendered ineffective assistance of counsel in failing to object to statements which did not reach the level of prejudicial impropriety. Brown elected to not object to the prosecutor's remarks and thereby highlight those very same remarks. The court finds no rendering of ineffective assistance of counsel regarding the failure to object to statements made prior to and during trial by the prosecutor and also no prejudice attends the prosecutor's remarks nor the failure to object to those remarks.

■ Petitioner's claims regarding prosecutorial misconduct have been procedurally defaulted; there is no cause and prejudice for which to set aside that default and, upon independent review, the court finds no constitutional violation, namely, denial of a fair trial under the due process clause attendant the actions of the prosecutor. The claims raised in subheading E, entitled "Inflammatory Statements by the Prosecutor" under paragraphs 71 through 80 in the petition for writ of habeas corpus, will be denied as a basis for the writ. The allegation of ineffective assistance of counsel found at paragraph 68(f) is unfounded and is also denied as a basis for the writ.

Finally, the court in *Murray* stated that even the cause and prejudice test regarding procedural default could be outweighed by the showing that a constitutional violation

has probably resulted in the conviction of one who is actually innocent. *Murray v. Carrier*, 477 U.S. at ——, 106 S.Ct. at 2650, 91 L.Ed.2d at 413. This court finds no such violation of the Constitution or the concept of fundamental fairness which would lead to setting aside the procedural default or granting the writ upon independent review.

To the extent the statements in this section represent findings of fact or conclusions of law, they shall be deemed such.

### III. FINDINGS OF FACT

1. On June 25, 1980, a criminal complaint was filed against Donald M. Paradis for the crime of murder in the first degree. Tr. A–5. On the same day a probable cause hearing was conducted (Tr. A–1) and Paradis ordered held to answer for the charge contained in the criminal complaint. Bail was denied. Tr. A–13.

2. Preliminary hearings were conducted on December 8, 9, 10 and 12, 1980, in the then-consolidated cases against Paradis and Thomas Henry Gibson. The court reviewed the evidence accumulated at that time, which omitted any medical evidence other than the cause of death and had no difficulty in concluding that it was more probable than not that Kimberly Palmer was murdered in Kootenai County, Idaho. Tr. A–129–35. The court noted the difference in cause of death and circumstances regarding the disposal of the bodies which suggested to the court that Currier had died in Spokane and Palmer had died in Idaho. Tr. A–134–35.

3. On December 30, 1980, an Information against Donald Paradis for the murder of Kimberly Palmer was filed in the state district court. Tr. A–137–38. After some disqualifications, the matter was assigned to the Honorable Gary M. Haman on January 22, 1981. Tr. A–144.

4. Paradis had been found indigent on November 25, 1980, and proceeded with appointed counsel.

5. Paradis was arraigned on February 3, 1981, at which time the court also denied Paradis's motion to dismiss for lack of speedy trial. Tr. A–158–61.

6. The court conducted hearings on February 24, 1981 (Tr. A–171), April 14, 1981 (Tr. A–179), April 24, 1981 (Tr. A–184), and April 29, 1981 (Tr. A–188). Motion to withdraw as counsel was filed by Frederick G. Loats on April 17, 1981 (Tr. A–181), which was granted (Tr. A–185) and William V. Brown appointed to represent Paradis. Tr. A–187.

7. After conducting hearings on motions to dismiss brought by Gibson and Paradis on May 18, 1981, Judge Haman entered an order denying defendants' motion to dismiss. The motion had been brought on the grounds that the evidence adduced at their consolidated preliminary hearings was insufficient to sustain the order holding them to answer to the charge set forth in their respective complaints. Tr. A–200–20. Judge Haman engaged in an extensive analysis of all of the evidence relating to the scene where the bodies were found, Paradis's home in Spokane, and the activities of the individuals in Post Falls, Idaho, on June 21, 1980. Again, the only medical evidence specifically reviewed was the cause of death of Currier and Palmer. Tr. A–210. Judge Haman concluded that it was reasonable that the killing of Palmer occurred in Kootenai County, Idaho (Tr. A–216), and that Paradis and Gibson were likely to have committed the offense charged. Tr. A–220.

8. An initial motion to sever the trials of Gibson and Paradis was denied by the court. Tr. A–263. Motion for special prosecutor and to disqualify the office of the Prosecuting Attorney was denied. Tr. A–281.

9. On June 15, 1981, the consolidated trial of Paradis and Gibson began with jury selection. Tr. A–284. After jury selection was completed, on June 22, 1981, the court granted Paradis's motion to sever. The Gibson trial proceeded and the Paradis trial was vacated and reset to commence November 30, 1981. Tr. A–290.

10. The trial in this matter began on November 30, 1981, with selection of the

jury and was concluded upon jury verdict December 10, 1981. Tr. A–372–389.

11. On December 21, 1981, defendant filed a motion for new trial. Tr. A–397. A hearing on the motion for new trial was conducted on February 24 and the morning of February 25, 1982. The hearing on aggravating and mitigating circumstances was conducted in the afternoon of February 25, 1982. Tr. A–422–32. Defendant's motion for judgment of acquittal and motion for new trial were denied by the court on March 24, 1982. Tr. A–464.

12. On April 2, 1982, the court entered its findings in considering the death penalty under Idaho Code § 19–2515 and concluded that the death penalty should be imposed. Tr. A–473–90. Judgment and sentence were pronounced on April 7, 1982. Tr. A–494.

13. Appeal was taken to the Idaho Supreme Court. Tr. A–497. The Idaho Supreme Court rendered its decision on the appeal, affirming the district court in *State v. Paradis*, 106 Idaho 117, 676 P.2d 31 (1983), *rehr'g denied* February 14, 1984. Justice Bakes wrote the decision for the majority with Justice Bistline filing a dissenting opinion in which Justice Huntley concurred.

14. A petition for post-conviction relief was filed on behalf of Paradis on April 13, 1984. Tr. H–14. An amended petition for post-conviction relief was filed on October 2, 1984. Tr. H–59. After hearings were conducted, District Judge Dar J. Cogswell entered a memorandum decision and order granting the State's motion for summary judgment in the post-conviction petition brought by Gibson and the petition brought by Paradis. Tr. H–110–54. Notice of appeal was filed January 17, 1985. Tr. H–169. The Idaho Supreme Court affirmed the district court in *Paradis v. State*, 110 Idaho 534, 716 P.2d 1306 (1986), *rehr'g denied* April 30, 1986. Justice Bistline wrote the opinion for the court with Justice Bakes concurring in the result.

### Failure to Preserve and Disclose Exculpatory Evidence

15. On Sunday morning, June 22, 1980, between 4:30 and 5:00 a.m., appellant's residence in Spokane, Washington, was reported to be on fire. Tr. B–95–96. The residence was located at South 24 Dearborn in Spokane, Washington. Tr. B–115. Investigator Skaggs entered the residence and, while in the basement, found a rolled-up piece of rug. Tr. B–119. Reddish-colored water was flowing from within the rug. Tr. C–145. Inside the rug was found a blue lawn dart, a marijuana leaf belt buckle, a toilet plunger, a string, and a pair of panties. Tr. C–145. Pieces of blue terrycloth were also found in the rug. Tr. C–153–55. The basement where the rug was located was used as a laundry/cleaning room and a clothesline hung across the room above the rug. Tr. C–151.

16. A piece of terrycloth found in the rug was matched with terrycloth used to tie the end of the sleeping bag in which Currier's body was found. Tr. D–383. The lawn dart which was found was said to have matched the puncture wounds in the back of Currier. Tr. D–430. The marijuana leaf belt buckle was identified as being Currier's. Tr. B–45. The petitioner has claimed in this proceeding that the string or cord found in the rug may have been linked to the ligature mark found on the neck of Palmer and that the Panties may have been Palmer's as she was found without panties. Petitioner alleges that the cord and panties found in the rug may have linked Palmer's murder to Spokane. Petitioner's Memorandum in Support of Motion for an Evidentiary Hearing and Outlining Law Applicable to Issues to be Raised at Evidentiary Hearing, filed March 6, 1987, at 35. These articles have never been linked to Palmer as have the items which were mentioned above that were linked to Currier. Palmer's mother testified that Palmer usually did not wear panties when wearing blue jeans. Tr. B–50. Palmer was found without panties, but was wearing jeans. Tr. D–334. The room where the panties were found was a laundry room. Tr. C–144. Testimony indicated that Palmer was wearing a very strong necklace, strung with waxed dental floss, at the time of her death. Tr. B–466–67. Testimony

from the State's pathologist, Dr. Brady, indicated that the necklace could well have caused the ligature mark. Tr. D–446.

17. Brown testified to this court that he had made a general request pursuant to Rule 16 of the Idaho Rules of Criminal Procedure, but did not make a specific request for the panties or the cord. Brown testified that he was aware that the panties and cord had been found in the rug and had seen photographs of such. The photographs of the panties and cord were admitted at the hearing before this court as Exhibits 8A and 42. Furthermore, as noted above, the finding of the cord and panties was referenced at trial. Tr. C–145.

18. The testimony before this court indicated that the items had been in the sole custody and control of officials from Spokane for their use in the earlier trial for the death of Currier in Seattle, Washington. Testimony from Kootenai County officials was that requests for the panties and cord were made, but that they were never located. If these items were lost, they were lost by Spokane County officials. There has been no showing that officials from Kootenai County had possession of, lost, destroyed or suppressed these items, or acted in bad faith.

19. The petitioner appears to have expanded his claim regarding lost, destroyed or nondisclosed evidence to certain colored pictures of the Palmer autopsy. Brown testified to this court that he was not aware of and had never seen the color slides or photographs of the Palmer autopsy. He testified that they would or may have affected his approach to the trial of the matter. On May 6, 1987, Brown filed with this court an affidavit correcting his testimony. Brown's affidavit states that he had exhibits made from such color slides and photographs prior to trial and that, recollection being refreshed, he had seen the color photographs and had them premarked as defendant's exhibits. By affidavit dated June 9, 1987, Brown states that he is not sure which of the color photographs he had marked for exhibits and does not fully recollect which pictures he had viewed. Testimony before this court

was that every effort was made to respond to Brown's discovery request, including the production of such pictures. The pictures were neither lost, destroyed, suppressed or undisclosed to petitioner and his counsel prior to trial.

### Medical Evidence

20. The medical evidence presented at trial came through Dr. William J. Brady (Tr. D–407–68, Tr. F–623–57) and Dr. Charles P. Larson (Tr. E–558–608). Further medical evidence found in the record is the testimony of Dr. Glenn C. Faith in support of a motion for new trial. Tr. G–87–115. In support of Paradis's petition for post-conviction relief, the affidavit of Dr. Glenn C. Faith was filed on December 2, 1984. Tr. H–106. Also, the affidavit of Dr. Elliot M. Gross was filed on January 7, 1985. Tr. H–160. The medical evidence presented to this court consists of the testimony of Dr. William J. Brady, Dr. Frank A. Roberts, and Dr. George R. Lindholm. The testimony of these individuals at the hearing conducted by this court has been transcribed and filed with the court. Finally, certain exhibits submitted to this court, marked and admitted, bear on the medical evidence in this matter.

21. The medical evidence presented in this case is relevant to petitioner's claims regarding failure to preserve the body of Palmer as evidence, the opinions of Dr. Brady are invalid and/or inadmissible as not being based upon scientific evidence reasonably relied upon by experts in the field (Fed.R.Evid. 703), sufficiency of the evidence, jurisdiction and ineffective assistance of counsel.

22. Dr. Brady conducted autopsies on the bodies of Currier and Palmer on June 23, 1980, in Portland, Oregon. Tr. D–418. Brady is a very well-qualified expert in the field of forensic pathology. Tr. D–407–13, Tr. E–592; Testimony of William J. Brady, M.D., April 14, 1987, at 64–68. Sometime after conducting the autopsy, Brady dictated and had transcribed an autopsy report. Plaintiff's Exh. 36. Brady concluded that the cause of Palmer's death was asphyxiation by strangulation. *Id.* Each expert

involved with this case has agreed that the cause of death was manual strangulation. Larson, Tr. E–592; Faith, Tr. H–106, Tr. G–101; Gross, Tr. H–161; Testimony of Frank A. Roberts, M.D., April 7–8, 1987, at 134–35 (combination ligature and manual strangulation); Testimony of George R. Lindholm, M.D., April 15, 1987 (in all material respects agreed with Brady).

23. Manual strangulation was the cause of death of Kimberly Palmer. Only Dr. Roberts places much significance on ligature strangling as bearing directly on the cause of death. Transcript Testimony of Frank A. Roberts, M.D., filed June 3, 1987, at 134–36. There is no supportable allegation that the autopsy and subsequent report is deficient in terms of those findings made suggesting strangulation. Brady's anatomic diagnosis regarding neck injuries is complete, suggests careful analysis, and is well documented. Plaintiff's Exh. 36.

24. Defendant's expert at trial, Dr. Larson, testified that as to the ligature mark, he may have made incisions at various places to determine how deep the blood was, but that, in any event, Palmer died of manual strangulation. Tr. E–592. The autopsy describes the ligature marks as to direction, size and position. Plaintiff's Exh. 36. The autopsy is supplemented, necessarily and properly, with photographs. Plaintiff's Exhs. 53A–Fl. Dr. Roberts used these photographs in his analysis of the ligature mark. Transcript Testimony of Frank A. Roberts, M.D., filed June 3, 1987, at 117. Dr. Roberts was able to further analyze the mark as to dimension through the photographs. *Id.* at 119. Dr. Roberts was of the opinion that Palmer's necklace did not cause the mark. *Id.* Brady described the ligature mark at trial and stated that Palmer's necklace reasonably could have caused the mark. Tr. D–446. He testified accordingly before this court. Transcript Testimony of William J. Brady, M.D., filed June 3, 1987, at 37. Dr. Lindholm was confident enough that he stated before this court that his opinion "with reasonable medical certainty" was that the marks on the neck were caused by the necklace. Transcript Testimony of George Richard Lindholm, M.D., filed June 3, 1987, at 29. From the testimony presented to this court and the record as a whole, it appears to this court that the ligature mark, relative to cause of death and place of death, deserves little weight. It does appear that the necklace is the most likely ligature under the circumstances. Whether the cord found rolled up in the rug in Spokane may be related to the ligature mark is purely conjectural. The cord cannot be said to have exculpatory qualities. In fact, Thomas Gibson has stated that he used a "wire" around Palmer's neck. Plaintiff's Exh. 5 at 5. The cord depicted in plaintiff's Exhibit 42 cannot be said to be a wire. There appears no basis to challenge the sufficiency of Brady's autopsy, opinions or conclusions based upon the ligature marks.

25. An issue in this case at trial was the time of death of Kimberly Palmer. Dr. Brady's autopsy report indicated that some early postmortem changes, decomposition, had begun with respect to Palmer. Plaintiff's Exh. 36. Brady noted in the autopsy report of Scott Currier that decomposition had begun. Plaintiff's Exh. 35. Brady testified at trial that Palmer's body was clearly not as decomposed as Currier's. Tr. D–432. Dr. Larson testified that an individual who was killed and placed in a sleeping bag would decompose more rapidly than someone placed in a stream at some point after death. Tr. E–596. When asked about the relative decomposition of the two bodies, Dr. Brady indicated that it was his opinion that Currier had been dead a number of hours longer than Palmer. Tr. D–452. Brady took into consideration the fact that Currier was found in a sleeping bag and Palmer in a stream and stated that it did not significantly change his opinion. Tr. D–454. Dr. Larson testified that the difference in temperature between the sleeping bag and the stream would affect the rate of decomposition. Tr.E–596. Dr. Faith agreed with Dr. Larson. Tr. H–108. Dr. Roberts agreed that Currier was more decomposed (Transcript Testimony of Frank A. Roberts, M.D., filed June 3, 1987, at 59), that temperature played a large part in the rate of decomposition (*Id.* at 42), and

could not offer an opinion as to which individual died first. *Id.* at 59–60. Dr. Brady testified before this court that Currier had decomposed more, and because of the factors, the decomposition process was more rapid in Currier. Transcript Testimony of William J. Brady, M.D., filed June 3, 1987, at 12. Dr. Lindholm also noted the factors involved and stated that the most commonsense interpretation is that the bodies expired at two different times. Transcript Testimony of George R. Lindholm, M.D., filed June 3, 1987, at 27. Clearly, under the circumstances of this case, decomposition as a tool for determining time of death is imprecise. There appears no dispute that it is inconclusive. Obviously, the circumstances of this case lead different, equally qualified, experts to different conclusions. Most importantly, the jury was presented with the conflicting interpretations and allowed to decide for themselves.

26. Another issue in this case which relates to determining the time of death is the absence of a potassium level analysis from a vitreous humor test by Dr. Brady. Dr. Brady did not conduct vitreous humor tests on either Currier or Palmer. Plaintiff's Exhs. 35, 36. Petitioner has alleged that the lack of a vitreous humor test evidences an incomplete and inadequate autopsy. Dr. Larson testified at trial that a vitreous humor test is one of the few for telling when a person dies and is accurate within two or three hours up to twenty-four to forty-eight hours after death. Tr. E.–590–91. Dr. Brady discussed at some length the aspects of the vitreous humor test and stated that the test could not have been performed on Currier because his eyes were badly injured and filled with blood which would not allow samples from Palmer to be compared. Tr. F–641–46. Dr. Faith has opined that the autopsy was incomplete because of the lack of a vitreous humor test. Tr. H–107. Dr. Roberts testified before this court that the vitreous humor test had been used over the years and been considered the standard in the medical community to help one determine the postmortem interval. Transcript Testimony of Frank A. Roberts, M.D., filed June

3, 1987, at 46. Dr. Roberts analyzed the description of the hemorrhages around the eyes noted in Brady's autopsy report and stated that it did not appear that the sample would be blood-contaminated. *Id.* at 47–48. Upon cross-examination, Roberts stated, "[w]ell, recently, I'm not sure that we place a lot of validity on this test. The reason I brought it up is that this autopsy was done in 1980 and at that time it was considered to be standard. Now I think there are more questions about its validity." *Id.* at 178. Roberts testified that there was at least a plus or minus four-hour variation in the test and when trying to determine which of two people died within a six-hour period of time, the test would be worthless. *Id.* at 180. Dr. Brady testified before this court that the samples were not taken because of the damage to Palmer's eyes (see plaintiff's Exh. 36), there could be no valid comparison to Currier's eyes since they were so badly injured, and that the plus or minus four-hour variation rendered it unhelpful in this case. Dr. Brady did testify that the drawing of such a vitreous humor test was an accepted standard in 1980 and is still used today, but not in every case. Transcript Testimony of William J. Brady, M.D., filed June 3, 1987, at 71–75. Dr. Lindholm testified that he more often than not did not draw vitreous potassium as a part of the autopsy procedure. Transcript Testimony of George R. Lindholm, M.D., filed June 3, 1987, at 32. As with decomposition, the vitreous humor test, to determine relative time of death, is imprecise. Moreover, under the circumstances of this case, the results would be of little use in determining which individual died first, assuming a non-contaminated sample could be drawn. The failure of Dr. Brady to perform a test has been somewhat discredited and randomly employed, especially under the circumstances of this case, cannot be a basis for attacking the completeness of the autopsy or the medical evidence upon which Brady based his opinions. The absence of vitreous humor testing was placed before the jury.

27. In his autopsy report, Dr. Brady notes a tear on Palmer's external genitalia.

"The labia majora on the left has a one and a half [inch] long tear with no evident vital reaction." Plaintiff's Exh. 36. Brown testified to this court that he elected not to discuss the tear on the labia because he did not want to raise the specter of sex or sexual abuse. However, Larson brought up the subject at trial. Larson stated that the injury to the external labia appeared to be a wound produced after death and gave his opinion, or rather speculated, that the tear was induced upon the dead body of Palmer as it was passed over the barbwire fence at the Mellick Road scene. Tr. E–581. The following testimony was also given by Dr. Larson:

Q. There were some photographs placed in front of you with respect to the wounds on the labia of Miss Palmer. If this had come before you, would you have been able to tell whether these wounds were prior to death or after death?

A. In most instances you would with a section, but not always, I can't say that would invariably be true, no. But if this wound occurred right at the time of death, I think it would be extremely difficult to determine, and probably impossible. If there was an interval of time between death and this wound of even say three to five minutes, I'm sure there would be changes which I could describe to you which would occur to you which you would see under the microscope. If I could say this occurred before death, if none of these changes are present, either this wound occurred almost at the time of death or it occurred after death.

Tr. E–597–98. Dr. Roberts testified that the inference from the description in the autopsy report regarding the labia is that it is a postmortem wound. He states that if it is not to be inferred as a postmortem wound, then it should have been removed and examined microscopically. Depending upon the amount of hemorrhaging observable, one may be able to determine whether the wound was premortem or postmortem. Transcript Testimony of Frank A. Roberts, M.D., filed June 3, 1987, at 81–82. Dr. Brady testified that a wound of that nature would be likely to bleed and stated that under the circumstances, perimortem bleeding and the bleeding or a loss of blood into and from the tissue immediately before death and immediately after death is often indistinguishable. Brady stated that microscopic examination of the tissue would be unnecessary to determine whether there was bleeding into the tissue because there obviously would be. Transcript Testimony of William J. Brady, M.D., filed June 3, 1987, at 21–33. Brady stated that the perimortem injury does not give adequate signposts as to whether it occurred minutes before or minutes after death. Id. at 87. He stated that the wound was consistent with a tear produced immediately before death or shortly before death. Id. at 90. Lindholm testified that the injury appeared to be postmortem, but could be perimortem, and if so, he would expect at least some bleeding. Transcript Testimony of George R. Lindholm, M.D., filed June 3, 1987, at 12–17. Dr. Lindholm also testified that the term "tear" as opposed to "cut" has a definite meaning and that Brady used it correctly. Id. at 19–20. This indicates that there is no correlation between the cut on the Levi's of Palmer and the tear on the labia. How and when the labial injury occurred cannot be determined. This aspect of the medical evidence is inconclusive. Dr. Brady described adequately the location and length of the wound in his autopsy. The significance of the wound was presented to the jury by Dr. Larson.

28. Petitioner has challenged the completeness of the autopsy report partly on the basis that it does not describe any injury to Palmer's left ear or an injury over the right eye. Dr. Brady testified at trial that from the pictures taken during the autopsy, injury to the left ear and an injury over the right eye could be seen. Tr. D–437. Brady testified that he had no independent recollection of the wound to the left ear and did not describe it in detail in his report. Tr. D–463. Dr. Roberts noted that there was nothing in the autopsy about the abrasion over the right eye or the injury to the nose. Transcript Testimo-

ny of Frank A. Roberts, M.D., filed June 3, 1987, at 129. Roberts stated that he would have described the injury over the right eye even if it may have simply been skin sloughing and the injury to the nose. *Id.* at 230–32. Dr. Brady testified that from the color photographs he believes that the ear was not involved in frank bleeding, but that skin sloughing could be the cause. Transcript Testimony of William J. Brady, M.D., filed June 3, 1987, at 91–92. This matter was presented to the jury through the testimony of Brady. Furthermore, Dr. Lindholm stated that photographs were very important as part and parcel of the autopsy report. Transcript Testimony of George R. Lindholm, M.D., filed June 3, 1987, at 7. Any potential injury over the right eye or to the left ear carries little significance with respect to the medical evidence in this case. Dr. Roberts attempted to draw significance to the left ear by hypothesizing that the blood in the left nostril and the blood in the left ear were related and somehow suggestive of pre-mortal injury. Transcript Testimony of Frank A. Roberts, M.D., filed June 3, 1987, at 124–28. The court places no significance on Dr. Roberts' hypothesis.

29. Petitioner alleges that Brady's autopsy report is inadequate because he did not do fingernail scrappings. Brady's autopsy describes Palmer's fingernails as short, dirty, neatly trimmed and without any irregular or broken edges. Plaintiff's Exh. 36. Brady testified at trial that he did not remember whether fingernail scrappings were taken on either Currier or Palmer. Tr. D–463–64. Before this court, Brady testified that the nails were just as described, short. He stated that scrapping short fingernails generally produces nothing. Transcript Testimony of William J. Brady, M.D., filed June 3, 1987, at 153–54. The matter was raised before the jury. Brady judged that fingernail scrappings would produce nothing and, therefore, elected at the time of the autopsy not to conduct such tests. Finally, there has been no suggestion that the results of fingernail scrappings would produce exculpatory evidence.

30. Petitioner urges that Brady should have excised wounds for microscopic analysis. Dr. Larson testified that he would have sectioned the ligature mark and the labial wound. Tr. E–589. Roberts testified that certain wounds should be excised and microscopically examined. Transcript Testimony of Frank A. Roberts, M.D., filed June 3, 1987, at 10–11. Brady testified that excising wounds is appropriate in some cases. Transcript Testimony of William J. Brady, M.D., filed June 3, 1987, at 157. The major wounds which could have been excised in this case were the ligature mark and the labial tear. However, as discussed above, it is quite doubtful that any further evidence would have been produced from such a procedure. The issue was placed before the jury.

31. Brady did not specifically describe rigor mortis or lividity in the autopsy. Plaintiff's Exh. 36; Transcript Testimony of William J. Brady, M.D., filed June 3, 1987, at 149. Rigor mortis was defined and discussed by Brady at trial. Tr. D–455–56. Dr. Larson mentioned rigor mortis. Tr. E–601. Dr. Larson described lividity at some length. Tr. E–584–86. Brown stated to Larson that Dr. Brady had testified that there was no lividity in this case. Tr. E–586. An aspect of lividity was central to Brown's attack upon Brady's conclusions and the attempt to show that Palmer died on her back. *See Id.* Dr. Brady testified that he had not described lividity in his autopsy report because, as he recalled, it was relatively indistinct, but from the pictures depicting the upper portion of Palmer's chest, he noted apparent lividity. Tr. F.–635–38. The issue was raised again on cross-examination. Tr. F.–654. As noted, the fact that Brady had not described rigor mortis and lividity in his autopsy report was placed before the jury and the import of rigor mortis and lividity was squarely debated before the jury. Brady explained to the jury why he had not made reference in the report to lividity. The fact that Brady did not describe lividity or rigor mortis in his autopsy report in no way undermines the report or the medical basis for his opinions.

32. Dr. Brady concluded in his report that Palmer's lungs were hyperemic and congested in the back. Plaintiff's Exh. 36. Brown attempted to show that Palmer died on her back because lividity, the settling of the blood and fluids, appeared to be posteriorly located. Brown attempted to show that for the lungs to have been congested and hyperemic in the back, Palmer would have had to die on her back and been placed there a substantial time before being placed face down in the creek. Dr. Larson adopted this theory. Tr. E–583–86. Dr. Brady indicated that if the bodies had been transported on their backs, there may have been a resettling of the fluid in the lungs. Tr. F–651. Dr. Brady reiterated in testimony before this court his finding that fluid was in the back of the lungs and that fluid can resettle. Transcript Testimony of William J. Brady, M.D., filed June 3, 1987, at 86. These experts have simply interpreted the facts that the lungs were congested in the rear and the position in which the body was found, in a different manner. Dr. Larson clearly set forth before the jury why he thought the evidence indicated that Palmer died on her back.

33. The primary issue raised by the petitioner with respect to the medical evidence is a challenge to Brady's testimony regarding aspiration of water and the existence of fluid in the lungs. Dr. Brady testified on direct examination that if Palmer had been manually strangled and immediately placed facedown in the water, it would be his opinion, given the fact that there was no break in the hyoid bone and no fracture of the thyroid cartilage, characteristic findings in a textbook strangulation, there will be a period of time when the ribcage and lungs continue to move and water will be aspirated or taken into the lungs. Brady testified that water would not naturally flow into the lungs. Tr. D–450–51. On redirect examination, Brady reiterated that Palmer had died by manual strangulation. Tr. D–466–67. When asked what role liquid played in Palmer's death, Brady responded:

A. An unknown amount, but I think it played a role in the death for the reasons I outlined here, because of the relative absence of petechial hemorrhages, it's not the textbook manual strangulation, and the changes in the lungs, the other changes that I observed indicate to me that the immersion in the water, the aspiration of water played a role, if not the terminal event, in this girl's death after she was strangled.

Tr. D–467. Brady's autopsy report describes Palmer's lungs as heavy, boggy and gelatinous. Plaintiff's Exh. 36. Brady testified that Palmer's lungs were over twice their normal size. Tr. D–447. Larson testified that if someone had aspirated fluid, he would expect to find that fluid in the lungs. If the fluid had come from a creek, he would microscopically analyze the fluid for zooplanktonic elements. Tr. E–593–95. During rebuttal testimony, Brady stated that Palmer did not die by drowning, but by manual strangulation. Tr. F–627. Brady stated that there was nothing in the lungs to contradict his findings of manual strangulation and that the findings in the lungs, the expansion, the pitting and fluffing, "fits." Tr. F–630–31. Brady further stated that, "I believe she was strangled, and shortly afterwards aspirated some amount of water during her terminal, during her last moments with her last breath, I think she inhaled some water." Tr. F–651–52. The upshot of Dr. Roberts' testimony was that pulmonary edema, fluid in the lungs, was consistent with aspiration, though there may be numerous other causes for the condition. Transcript Testimony of Frank A. Roberts, M.D., filed June 3, 1987, at 63–71. Roberts testified that it may be difficult to differentiate between water and edema. Id. at 34. Roberts stated that he would have examined the trachea for foreign materials. Id. Dr. Brady agreed that pulmonary edema can come from any sources. Transcript Testimony of William J. Brady, M.D., filed June 3, 1987, at 46–47. He testified that the edematous condition would be exceedingly unusual in a pure strangulation case. Id. at 47. Brady summarized his views regarding aspiration of fluid by stating "that I think this is a reasonable explanation for

the clearly excessive weight, the unusual collection of fluid and the appearance of this lung. I think it is a very reasonable explanation." *Id.* at 48. Brady testified that in a normal strangulation case he would expect the lungs to be air-filled and fluffy, and in this case he found them boggy and gelatinous. *Id.* at 49. Brady stated that Palmer was strangled and that aspiration of water may have played a role, but that it was not the cause of death. *Id.* at 175. The court finds that Dr. Brady has consistently stated that Palmer died of manual strangulation and that, given the heavy lungs and the fact that Palmer was found facedown in a creek, the aspiration of water may have taken place as an agonal event. This description was presented to the jury.

34. The court has considered all of petitioner's arguments regarding the alleged inadequacies in Dr. Brady's autopsies, the alleged errors in the rendering of his medical opinions and conclusions, and all of the arguments and evidence regarding the medical aspects of this case, including those not specifically discussed above, and finds no error. Furthermore, petitioner's attempts to impeach Dr. Brady in this proceeding carry no weight with this court and are misplaced.

35. The court finds that all of the relevant medical evidence upon which petitioner now makes his claims and arguments was presented, in the first instance, to the jury.

*Non-Medical Evidence*

36. In this section, the court will review the evidence presented at trial of a non-medical nature. In other words, the evidence regarding the activities of Currier and Palmer, Paradis and others, evidence found at the scene where the bodies were recovered and evidence obtained from the Paradis residence in Spokane, Washington. Petitioner has alleged that insufficient evidence was presented at trial to convince a rational juror that Kimberly Palmer was killed in the State of Idaho. This issue is related to the question of jurisdiction exercised by the State of Idaho.

37. At approximately 12:45 a.m. on Saturday, June 21, 1980, a clerk at the Paul Bunyan Motel in Spokane, Washington, checked out a room to a man who was accompanied by an unidentified female. Tr. B–84–85. The couple was driving a light blue and white Volkswagen van with California license plates and a Harley-Davidson sticker on the back window. Tr. B–86. The van was identified as belonging to Brenda Russell, the fiance of Scott Currier. Tr. B–53. The man at the motel was identified as Currier. Tr. B–91. Currier was given a receipt from the hotel. Tr. B–93. After rummaging through the back of the van, Currier went back into the motel office and asked for his money back, stating that somebody had stolen his guns and he knew who did it. The money was refunded. Tr. B–88.

38. On Saturday, June 21, 1980, Ruth Jones went out to water her lawn on Schilling Loop in Post Falls, Idaho, at about 6:30 or quarter to 7:00 a.m. Tr. C–330–32. While watering her yard she saw a blue and white Volkswagen van with California license plates pass her house driving up Mellick Road. Tr. C–232–35. Two or three people appeared to be in the van and one of the passengers had a grey-colored cap. Tr. C–234. About a half-hour later, Mrs. Jones saw three individuals walking from the area of Mellick Road toward Post Falls. Tr. C–236–38. One of the individuals carried a blue blanket which concealed some object. Tr. C–238. At between 7:00 and 7:30 a.m. that same morning, Ronald Hildebrandt observed three individuals coming from the south toward Post Falls. Tr. C–248–49. One of the individuals was carrying a rigid blue sleeping bag or some similar item. Tr. C–250–51. At approximately 9:00 a.m., Dale James, owner of Handi-Mart Grocery Store in Post Falls, Idaho, observed an individual in his store and one walking across the street who was carrying a blue blanket which was wrapping something inside. Tr. C–256–60. At sometime prior to noon, Lois O'Reilly observed an individual in TJ's Pantry Restaurant in Post Falls, Idaho, where she was employed. The individual carried either a blue or green blanket which contained

some object inside. Tr. C–264–67. Between 7:30 and 7:45 a.m., Post Falls City Policeman Hollis Kenner observed two individuals exiting the Spokane Street bridge, northbound, one of which he identified as Paradis. Tr. C–271–76. One of the individuals carried a blue blanket. Tr. C–274. After receiving a complaint that a man had just left TJ's Pantry possibly carrying a gun, Officer Kenner proceeded to Rob's Drive-In and together with Lt. Rapp, he positively identified Paradis, Gibson and Larry Evans. Tr. C–276–81. The two individuals Kenner had seen earlier in the morning were identified as Gibson and Paradis. Tr. C–277–81. The individual with the blue blanket was identified as Gibson. Tr. C–279. At approximately 8:00 a.m. that same morning, Robert Simon, owner of Rob's Drive-In, observed the three individuals, one of which carried the blanket. Tr. C–293–95. Officer Rapp corroborated the testimony of Officer Kenner. Tr. C–304–15.

39. On Sunday morning, June 22, 1980, Mrs. Jones and her husband traveled up Mellick Road and observed the van tipped over and pointed in a northerly direction. Tr. C–240. The Sheriff's Office was contacted. Tr. C–241.

40. Kootenai County Officer Terry Thomason was dispatched to the site of the vehicle rollover. Tr. C–175. Thomason proceeded up Mellick Road and observed the van. Tr. C–182. A wrecker was summoned and began removing the van. Tr. C–184.

41. At the scene a red sleeping bag was found twenty to thirty feet north, or in front, of the van and to the west. The bag was empty. Tr. C–185. Thereafter, Palmer's body and the sleeping bag containing Currier's body were located. Tr. C–187–89.

42. Currier's body was found in a blue sleeping bag which had been tied shut with a piece of terrycloth. Tr. D–342. This sleeping bag was found to the south, or behind, the van. Tr. D–342; Tr. C–388; Plaintiff's Exh. 33. The sleeping bag containing Currier's body was located twenty to twenty-five feet down a steep embankment from the road surface. Plaintiff's Exh. 33. Inside the bag was Currier's body clad only in a pair of shorts and one sock. Tr. D–345. Around his neck was a piece of blue terrycloth. Tr. D–345. Currier had been badly beaten and puncture wounds had been inflicted on his back. Tr. D–345; Plaintiff's Exh. 35. Currier's leather belt was found on the jeans removed from the sleeping bag with the belt buckle having been severed. Tr. D–353.

43. Palmer's body was found facedown in a stream. Tr. C–187; Plaintiff's Exhibits 11, 12. Palmer was wearing a pair of blue Levi's and was bare from the waist up. Tr. C–188. Plaintiff's Exhs. 11, 12. Palmer was wearing brown tennis shoes and socks. Tr. D–334. The left rear pocket of Palmer's Levi's had been torn. Tr. D–334; Plaintiff's Exhs. 11, 12. Under Palmer's left leg, near the knee, a baseball-type corduroy cap with the word "Levi" was found. Tr. D–336; Tr. C–202. Larry Evans was known to have worn a corduroy, Levi, faded-blue cap. Tr. B–58. Underneath Palmer's right shoulder was found her tank top with the words "let's party." Tr. D–338; Tr. C–202. Plaintiff's Exhibit 33 shows Palmer's body down the steep slope directly away from the van approximately eighty feet. Elliot testified that a rope of fifty feet was used and reached almost to the creek. Tr. D–343. Elliot testified that the terrain to Palmer's body was steep with underbrush and debris on the ground. Tr. D–333. To get to the body, one had to cross a three-strand barbwire fence. Tr. D–333. Thomason testified that the fence was three or four strands with wooden posts and the drop-off on the west side, or lower side, was dramatic, making the top strand quite a distance from the ground. Because of the lay of the land, the fence was rather high. Tr. C–187. The fence appears to be slightly less than halfway between the road and the creek surface. Plaintiff's Exh. 33. The fence is depicted in pictures marked as plaintiff's Exhibits 13 and 19. The broken fencepost also depicted was broken by Officer Thomason. Tr. E–490.

44. The Paradis residence was located at 24 Dearborn in Spokane. This residence

is about a block away from the Paul Bunyan Motel. Tr. B–95. Between 4:30 and 5:00 a.m. on Sunday, June 22, 1980, a fire was reported by the clerk from the Paul Bunyan Motel at the Paradis residence. Tr. B–95. After some evidence of the crime of arson and perhaps a violent crime had been found by Fire Marshal Robert Skaggs (Tr. B–119), Skaggs and Officer McCabe returned to the residence with a search warrant to obtain evidence. Tr. C–142. Fire Marshall Skaggs determined that the fire had been caused by arson. Tr. B–125. McCabe located the rolled-up rug and the lawn dart, toilet plunger, terrycloth, cord, belt buckle and panties. Tr. C–145–153. Other evidence of a violent crime was located by McCabe. Tr. C–158, 162. Paradis had been seen in the area of his home at 3:00 a.m. on Sunday morning, just prior to the fire. Tr. B–98–106. On Monday, June 23, 1980, Paradis was arrested at an abandoned Texaco station. Tr. C–163–67.

45. Magistrate Kosonen determined that, in determining probable cause, Palmer was probably murdered in Kootenai County, Idaho, based solely upon the evidence found at the scene. Tr. A–135. After lengthy hearings, Judge Haman denied defendant's motion to dismiss based upon insufficiency of the evidence presented at the preliminary hearing. Tr. A–220. Judge Haman reviewed all of the "non-medical evidence" and only the medical evidence regarding cause of death and found it reasonable to conclude that Paradis participated in the transportation and acts resulting in Palmer's death. Tr. A–220. Judge Haman's review of the evidence presented prior to trial is very complete and detailed. Judge Haman's Findings of the Court in Considering Death Penalty Under Section 19–2515, Idaho Code, also reviews the evidence in this matter. Tr. A–473–90. The evidence is reviewed by Judge Dar Cogswell in his memorandum decision and order granting the State's motion for summary judgment. Tr. H–110–54. Upon direct appeal, the Idaho Supreme Court in *State v. Paradis*, 106 Idaho 117, 676 P.2d 31 (1983), found that the State had presented a strong circumstantial case

against Paradis and thereafter reviewed certain evidence, without reference to medical evidence and stated that the circumstantial evidence presented was more than sufficient to support the conviction of Paradis. *Id.* 106 Idaho at 121, 676 P.2d 31. In *Paradis v. State*, 110 Idaho 534, 716 P.2d 1306 (1986), the court quoted at length from its previous decision and found that petitioner's claims regarding sufficiency of the evidence and jurisdiction had been determined on direct appeal.

46. This court finds the evidence from the Mellick Road scene to be very convincing in regard to the fact that Palmer was killed in Idaho. The differences in cause of death, relative injury inflicted to the bodies, position of the bodies relative to the van, and the existence of the red sleeping bag are particularly telling. This court, like others before, has a great deal of difficulty in believing that if Palmer were dead prior to arrival at the Mellick Road scene, her body would be meticulously transported down a steep incline across a significant barbwire fence and placed face-down in a creek. It simply is not consistent with the disposal of a body, as is the evidence with respect to Currier. Particularly important to this court are plaintiff's Exhibits 11 and 12 as compared with plaintiff's Exhibit 62. Plaintiff's Exhibit 62 clearly shows rigor mortis which conforms to Palmer's position depicted in plaintiff's Exhibits 11 and 12. Dr. Lindholm very adequately summarized the evidence in this case which clearly points to and is consistent with Palmer's death in Idaho. Transcript Testimony of George R. Lindholm, M.D., filed June 3, 1987.

47. As outlined above, the evidence to link Currier's death to Paradis's residence in Spokane, Washington, is clear. There is no evidence of such quality or magnitude to link Palmer's death to the Spokane residence. Even considering the existence of a cord and the panties in the rolled-up rug, this court can find little or no substantial evidence to link Palmer's death to Spokane.

48. The court places, as did the Idaho Supreme Court, little significance and secondary importance on the medical evidence

in this case. The other evidence which has been clearly detailed and reviewed by each court and presented at trial is sufficient to sustain the jury's determination and an independent determination that Palmer was killed and died in Idaho.

### Double Jeopardy

49. The issue of double jeopardy has been raised before every court which has been involved in this matter. The issue relates to whether Paradis could be tried for the murders of Currier and Palmer separately under the principles announced in *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), and whether the fact that evidence regarding the Currier murder was admitted at trial raises the specter of double jeopardy. Magistrate Kosonen, in reviewing probable cause, took up the issue of the application of *Ashe* to the case at bar. Magistrate Kosonen found that Currier's death was due to massive head injuries and he was found enclosed in a tied-up sleeping bag, while Palmer met her death by asphyxiation due to strangulation and was found unfettered lying atop a portion of her clothing. The court stated that it had no difficulty in accepting the characterization that a single robbery transaction had occurred in *Ashe* with six individual victims, while in the circumstances of this case there were clearly two separate transactions. Tr. A–133. The court stated that it was not necessary to relitigate the general issue present in Paradis's trial in Washington for the death of Currier as the Washington jury had simply found that there was reasonable doubt whether the defendants had murdered Currier. The court stated that the State need not prove that the defendant killed Currier in this case, but must show the companionship of Currier and Palmer, their being together during the hours before their deaths, and the situation with respect to each death in order to show a rational and cohesive scenario. The court found that precluding all reference to Scott Currier would militate against an intelligible fact presentation. Tr. A–133. On February 24, 1981, Judge Haman heard argument on motions to dismiss for double jeopardy rea-

sons and took the matter under advisement. Tr. A–176. This court cannot find in the record Judge Haman's decision on the matter. Obviously, the fact that the case was tried indicates that Judge Haman at some point denied the motions for dismissal on double jeopardy grounds. During proceedings just prior to the start of trial, Judge Haman denied Brown's motion in limine regarding evidence of the death of Scott Currier. Tr. A–374. Evidence and photos regarding the finding of Currier at the Mellick Road scene, evidence and photos relating to Currier's murder at Paradis's home in Spokane, photos and testimony regarding the autopsy and medical findings with respect to Currier were all admitted over continuing objection by defense counsel. Defense counsel's objections were based upon relevancy, alleged inflammatory and prejudicial nature of the evidence and, assumedly, as it bears on the issue of double jeopardy.

50. The Idaho Supreme Court, in *State v. Paradis*, 106 Idaho 117, 676 P.2d 31 (1983), reviewed Paradis's objections to the introduction of the evidence regarding Currier's death and the specific issue of double jeopardy with its attendant collateral estoppel rule. *Id.* 106 Idaho at 121–124, 676 P.2d 31. The court noted that generally evidence of other crimes of a defendant is not admissible at trial to show the defendant's criminal propensity; however, such evidence may be admitted to prove motive or to show a common scheme or plan, among others. *Id.* at 121, 676 P.2d 31. The court found that the evidence of the Currier death was presented not for showing Paradis's criminal propensity, but for the purpose of showing motive and a common scheme or "a rational and cohesive scenario." *Id.* at 122, 676 P.2d 31. The court found distinguishable the facts in this case with the facts underlying the case of *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). The court reiterated that the evidence of Currier's death was not employed to show the jury that petitioner was guilty of Currier's death, but rather to explain a possible motive for the murder of Palmer. The court

stated that evidence of knowledge on the part of Paradis as to the death of Currier suggests a possible motive and implication in Palmer's death. The court stated that regardless of Paradis's guilt or innocence in the Currier murder, the evidence of Currier's death was highly relevant to show a possible motive for his involvement in Palmer's murder and because the issue of Paradis's knowledge regarding the Currier death was not necessarily precluded or decided in a verdict of acquittal, the issue was not collaterally estopped and did not raise a problem of double jeopardy. *State v. Paradis*, 106 Idaho at 122–24, 676 P.2d 31. Justice Bistline, in dissenting, in which Justice Huntley concurred, attacked on several grounds the admission of evidence relating to Currier's murder. Bistline believed such admission was error. *Id.* at 127–37, 676 P.2d 31. Judge Cogswell denied petitioner's request for post-conviction relief under his double jeopardy claim on the grounds that it had previously been decided by the Idaho Supreme Court upon direct appeal. Tr. H–144. In *Paradis v. State*, 110 Idaho 534, 716 P.2d 1306 (1986), Justice Bistline, in writing the opinion for the court, found that this issue regarding the Currier evidence and double jeopardy having been previously appealed directly to the court could not be raised again in post-conviction proceedings.

51. While the facts in *Ashe* do suggest a single robbery transaction with six victims, the facts in this case as outlined above suggest that the murders of Palmer and Currier are two separate transactions, occurring under different circumstances, at different times and different locations. Any claim of double jeopardy in this case by mere analogy to *Ashe* is misplaced.

52. On June 19, 1980, Palmer and Currier left Palmer's home in Spokane to go camping in Idaho. Tr. B–35–37. Palmer and Currier were in the faded blue and white Volkswagen van later found at the Mellick Road site. Tr. B–37, 42–43. A clerk at the Paul Bunyan Motel, approximately a block from Paradis's residence in Spokane identified Currier as the man who checked into and then immediately checked out of the Paul Bunyan Motel together with an unidentified woman. Tr. B–83–91. The clerk identified the blue and white Volkswagen van. Tr. B–92. The bodies of Currier and Palmer were found near the place where the Volkswagen van had been overturned at the Mellick Road site. Tr. D–330–57.

53. No eyewitness came forward at the trial of Paradis for the murder of Palmer. The State's case was circumstantial. In order to present to the jury a rational and cohesive scenario, references to Currier and his demise could not be omitted. Currier and Palmer had been identified as being together from the late afternoon of June 19, 1980, until their bodies were found together on June 22, 1980. Evidence regarding the disparate treatment of the bodies at the Mellick Road scene was crucial to proving that Palmer had died in Idaho, linking Paradis to the murder, and to support jurisdiction in the State of Idaho. Evidence regarding the different causes of death and relative infliction of injury to the bodies of Currier and Palmer was also relevant to show that the deaths had occurred under different circumstances at different times and different places. Medical evidence relating to the cause of death, the time of death, and the position of death was also relevant to show the differing circumstances with respect to the two individuals. Evidence regarding the different condition, position and treatment of the bodies of Currier and Palmer were extremely relevant in proving when and where Palmer was killed.

54. The evidence regarding Currier's death was also relevant to show motive and a common scheme, plan or design. Strong evidence linked the murder of Currier to Paradis's residence at 24 Dearborn in Spokane, Washington. Who killed Currier has not been determined, and Paradis was acquitted by jury verdict of the death of Currier. Paradis, however, was positively linked to the site on Mellick Road where the body of Currier and that of Palmer were found. Obviously, if Paradis was at the Mellick Road site, he was participating in the disposal and "coverup" of Currier's

body and murder. One need not infer that Paradis killed Currier in order to come to such conclusion. Palmer's body was found at the same site as that of Currier. This court has previously found that the evidence regarding the condition and positions of the bodies at the Mellick Road site alone is sufficient to sustain a finding that Currier had been killed at a different location prior in time and that Palmer had died at the site where her body was found. The evidence is sufficient to convict Paradis of the murder of Palmer by virtue of the witnesses that placed him near the scene of the Mellick Road site and that Palmer, in all likelihood, died at that site. This is so, irrespective of motive. However, the element of motive is suggested by the probability that the murder of Currier occurred at Paradis's house and Paradis was motivated to assist in the coverup and disposal of Currier's body. As such, there can be an inference that Paradis was willing to take the next step in the coverup of the Currier murder by silencing Palmer.

55. In his opening statement, the prosecutor related to the jury what he believed the facts to be presented at trial would show and the scenario of events which likely occurred culminating in the death of Palmer. In his opening statement, the prosecutor stated that Palmer "knew too much" and that the three men at the scene on Mellick Road could not allow her to go free and that she was silenced by strangulation. Tr. B–15–34. In his opening statement, Brown told the jury that the State contended that Paradis was involved in the death of Palmer in order to coverup the death of Currier. Brown stated that the evidence would show that Paradis was found not guilty by a jury for the death of Scott Currier in the State of Washington. He summarized that, therefore, there was no motive for Paradis to be involved in the death of Palmer. Tr. E–486–87. In his closing statement, the prosecutor attempted to show that the death of Palmer was to coverup the death of Currier. The prosecutor related that the evidence showed that Currier had died in Paradis's home in Spokane and that Currier's body and Palmer were transported by Evans, Gibson and

Paradis to the Mellick Road site. The prosecutor reviewed the evidence with respect to Palmer having died at the Mellick Road site. He theorized that Palmer, being alive at the time of the disposal of Currier's body, tried to escape, but was caught and strangled to death because she knew too much and could not be set free or taken hostage. Tr. F–695–706. In this context, the prosecutor made the following comments:

Was the defendant Donald Paradis a knowing participant in this crime? The state has alleged a motive here, the motive was to cover up a prior criminal act, cover up the death of Scott Currier. The defense in his opening statement says that there was no motive because three months later Donald Paradis would be acquitted in Seattle of the death of Scott Currier. Well, ladies and gentlemen, that doesn't say anything about what was going through the mind of Donald Paradis on the 21st of June, 1980. He had no idea what the legal technicalities would do three months down the line. He knew what he had done. To say that he would later be acquitted, that doesn't erase motive. He knew in his own mind what he had done, and he knew he had to cover it up. In fact, maybe because he covered it up he was acquitted, be that as it may.

Tr. F–695. The above-quoted statement, especially taken out of context, contains an inference that Paradis murdered Currier, and to that extent, is improper. However, the inference contained in the statement did not prejudice Paradis to the extent of rendering the trial fundamentally unfair. The context of the statement was that Currier had been murdered in Paradis's residence and that Paradis, among others, was covering up that murder by disposing of Currier's body and ultimately in murdering Palmer. The prosecutor's inference could not overbear the evidence presented at trial and, therefore, render the verdict suspect.

56. The court finds that the evidence admitted regarding the Currier murder was not so extensive or innately inflammatory so that it is more prejudicial than

relevant. As early as voir dire, the jurors were made aware of the probability of seeing gruesome pictures and each stated they could handle the prospect. Plaintiff's Exh. 51. The jury was informed that Paradis had been found not guilty of the murder of Currier. The ultimate issues litigated in the trial for the Currier murder were not retried in the Palmer trial and Paradis was not forced to run the gauntlet of the Currier murder in the Palmer trial.

### Ineffective Assistance of Counsel

57. Judge Cogswell described Brown's representation of Paradis as "in the highest form of the profession and his trial procedure and questioning was comparable with that of attorneys of many years experience." Tr. H–152. In *Paradis v. State,* 110 Idaho 534, 716 P.2d 1306 (1986), Justice Bistline found that trial counsel did a superb job of litigating the jurisdictional issue and overall did a commendable job. Before reviewing certain particulars raised by the petitioner, this court finds that Brown's overall representation and performance at the pretrial, trial and posttrial stages of this matter was exemplary.

58. The court hereby incorporates into this section those findings regarding voir dire, prosecutorial misconduct, venue and lost or destroyed evidence. The court finds counsel's representation regarding these matters to clearly exceed the standard of reasonably effective assistance of counsel contemplated by the sixth amendment. Petitioner has claimed that Brown lost credibility with the jury by referring to the motorcycle "gang" as a "club." Yet, the prosecutor was the first to refer to the motorcycle club. Exh. 51, Vol. 1 at 18; Tr. B–18.

59. With respect to the failure to obtain co-counsel or contact the petitioner's Washington counsel, Brown did not need such assistance to effectively represent petitioner. Brown testified to this court that he did not contact petitioner's Washington counsel as he felt the offer of assistance was half-hearted and exercised his judgment to that effect. Brown's relative inexperience was never exhibited during his representation of petitioner.

60. The court finds no substantiation for the claim that Brown spent insufficient time in preparation of the case. As noted by the Idaho Supreme Court, the one hundred fifteen hours spent preparing for trial is neither shown to be inadequate nor suggestive that Brown was unaware of the law or facts of the case. The court finds that the testimony which could have been presented by Roger Pevin would, in all likelihood, be cumulative to the testimony presented by Sid Wurzburg (Tr. F–610–16) and Paul Wasson (Tr. F–616–22). Brown indicated to the trial court on the motion for new trial that he had made every effort to attempt to contact Roseanne Moline. Moline testified in support of the motion for new trial. Tr. G–3–85. As noted in the order denying the motion for new trial (Tr. A–455), the testimony of Moline would be unlikely to change the result at trial especially in light of the testimony of Beaver and the statements of Gibson. Tr. A–462–63. The testimony of Dr. Faith in support of the motion for new trial is cumulative to that given at trial by Dr. Larson. Tr. G–87–115.

61. There is no substantiation that Brown failed to review with Aera Beaver her testimony before trial and Beaver's testimony, if believed, would have provided an alibi.

62. Paradis's allegation that Brown failed or was denied competent expert evidence pertaining to Dr. Brady's testimony is absolutely false. This court was astounded to review the professional qualifications of Dr. Larson which comprise thirteen pages in the transcript. Tr. E–558–70. Larson's testimony as elicited by Brown provided a clear and cogent view of the evidence in this case and culminated in an opinion which, if adopted by the jury, could well have led to a verdict of not guilty. Tr. E–571–608. Of the numerous pathologists related to this case, none were more qualified than Larson. Larson's fees were ordered paid. Tr. A–399.

63. Paradis alleges that Brown failed to request for examination tissue

samples preserved from the Palmer autopsy, but makes no showing that these samples would have provided exculpatory evidence or other evidence not adequately presented at trial. The same is true with respect to testing the sleeping bag and Levi's for blood, which has shown negative and strength testing of the necklace, unrelated to the direct cause of death.

64. Brown's failure to disqualify Judge Haman has not been shown to have been caused by negligence or unawareness of his right to do so and was in all likelihood a tactical decision. In any event, especially as noted below, no prejudice has been shown by not disqualifying Judge Haman.

65. The court finds no deficiency in Brown's cross-examination of State witnesses. The defense testimony primarily elicited from Larson pertaining to Palmer's jeans and the creek water was coherent, complete and potentially damaging to the State's case. The reading of expert testimony pertaining to soil samples was a tactical decision made by Brown, and upon reading the transcript of that testimony, the court finds that it provided some evidence in support of the defense.

66. Brown, through Larson, offered an alternate version of the facts and circumstances surrounding Palmer's murder by clearly attacking the sufficiency of the Brady autopsy and his conclusions and providing a witness, Larson, who gave an expert opinion that Palmer had died on her back and was dead prior to being transported to the Mellick Road scene. That certainly is an alternate view of the evidence.

67. Brown made a tactical decision not to place Gibson on the witness stand. It is quite evident that Gibson's credibility as a witness for Paradis would be minimal. In the face of the other evidence presented by the State, Gibson's testimony may well have been viewed in the same light as that of Aera Beaver.

68. Petitioner has alleged that Brown spent inadequate time preparing for the sentencing hearing. It appears to this court that Brown spent at least twenty hours preparing for the sentencing hearing. Tr. A–435. Paradis stated to the court that he had had adequate time to go over the presentence investigation and psychological evaluation with Brown. Tr. G–157. Brown pointed out each item in the presentence report which was inaccurate, needed clarification or was objectionable. Tr. G–158–65. The prosecutor relied on the evidence adduced from the presentence report and presented nothing further at the sentencing hearing, other than recommendation. Tr. G–169. Certainly, there was nothing, specific to the sentencing hearing, presented by the State with which Brown would be charged with the obligation to rebut. Brown presented the testimony of Rev. William Arlen Whorton, an ordained minister, who was administrator of a Bible College attended by Paradis. Whorton testified that Paradis had been on the road to rehabilitation and that he could be rehabilitated. Tr. G–170–76. Obviously, the prospect of rehabilitation could weigh heavy in opposition to the imposition of the death sentence. The prosecutor reviewed the evidence presented at trial upon which the verdict of guilty was based and recommended the death sentence. Tr. G–180–92. In turn, Brown reviewed the evidence presented at trial, attempted to minimize Paradis's prior convictions in order to show that he was not the type of "hardened killer" to which the death sentence was appropriate, and pointed out that Paradis could be rehabilitated. Tr. G–193–99. The affidavit of Rev. Dropko and approximately six credit certificates accrued since 1980 in religious studies by Mr. Paradis were submitted to the court. Tr. G–177–78. Also, Brown pointed out in the presentence report a letter from the prison chaplain in Spokane County, Spokane, Washington. Tr. G–177. Paradis was allowed to speak on his own behalf and essentially attacked the State's evidence at trial and reiterated his innocence. Tr. G–199–208. The prosecution had submitted an enumeration of aggravating circumstances prior to the hearing. Tr. G–414. Brown submitted a memorandum regarding mitigating circumstances. Tr. G–418. In the memorandum, Brown attempts to cast doubt on the jury verdict, especially in light of exculpatory

evidence from Gibson and Moline. Brown also points out the possibility of rehabilitation. Tr. G–420. Judge Haman entered extensive findings regarding the death penalty. Tr. G–473–90.

69. The court finds that Brown's representation of Paradis at the sentencing stage of this matter was adequate. The particulars raised by petitioner with respect to additional circumstances which could have been raised or developed are unsubstantiated and do not suggest that the outcome of the proceeding would have been different. There is no prejudice to the defendant as to any of the alleged deficiencies.

*Denial of Confrontation at Sentencing*

70. Petitioner now claims that he was denied the right to confront and cross-examine witness Gibson by virtue of the fact that Judge Haman had received a letter from Gibson and met in chambers with Gibson. However, it was generally acknowledged that the letter and statements made by Gibson in chambers were exculpatory for Paradis and incriminating to Gibson. It was near the time in which the letter was delivered and after reference to the letter that Paradis was willing to waive his rights to a speedy trial and allow Gibson to go to trial first, assumably so that Gibson could be able to testify at the Paradis trial. Tr. G–287. It is incredulous now that petitioner claims the denial of confrontation when the sentencing court was asked to bear in mind Gibson's testimony, which was exculpatory to Paradis, and the statements made in camera. Tr. G–420; *see also* Tr. G–206. Judge Haman's honest statement that he may not totally be able to put out of his mind other evidence that he's heard, particularly at the Gibson trial (Tr. G–179), bespeaks of no bias and no inference that Judge Haman considered improper evidence in determining the appropriate sentence. The same is true with respect to his findings regarding the death penalty. Tr. A–473–90.

71. Petitioner's allegation that he was denied an impartial sentencing authority is completely without merit. The statement that was made by Justice Bistline to the effect that few people probably have much respect for members of motorcycle gangs, *State v. Paradis*, 106 Idaho at 133, 676 P.2d 31, cannot be attributed to Judge Haman. This court finds nothing in the record to support the tacit allegation that Judge Haman, or any trial judge, could not properly act as an impartial authority when there are multiple defendants involved in a crime who are either tried together or in separate trials. There is no basis in the record, nor inferences to be drawn therefrom, to support an allegation that Judge Haman did not act as an impartial sentencing authority. Petitioner was denied payment of fees with respect to the secreting of Moline. Tr. A–441–54. No prejudice befell the petitioner since Moline testified at the hearing on motion for new trial. Tr. G–3–85. Numerous requests for fees were ordered paid. Tr. A–199, 231, 236, 283, 296, 314, 356, 358, 369, 371, 396, 399, 401, 407, 437, 439, 472. Any motion for fees that may have been denied did not prejudice the assistance rendered petitioner. The consistent authorizations by Judge Haman rebuts any assertion of impropriety or underlying prejudice. This court would characterize the assertion as "a fishing expedition."

72. Judge Haman's findings in regard to aggravating circumstances were complete to the extent necessary, with respect to personal involvement and state of mind with respect to the murder of Palmer. *See* Tr. A–430–90.

73. To the extent that any Conclusions of Law are deemed to be Findings of Fact, they are incorporated into these Findings of Fact.

## IV. CONCLUSIONS OF LAW

1. To the extent that any Findings of Fact are deemed to be Conclusions of Law, they are incorporated into these Conclusions of Law.

2. Petitioner's claims regarding change of venue and prosecutorial misconduct have been procedurally defaulted by the Idaho Supreme Court. *Paradis v. State of Idaho*, 110 Idaho 534, 716 P.2d 1306 (1986).

The case of *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), does not carve out a general exception to the procedural default rule in capital cases under Idaho law. Petitioner's claims regarding venue and prosecutorial misconduct were not properly raised. Idaho Code § 19–4908. Petitioner has failed to satisfy the cause and prejudice standard for disregarding the default set forth in *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). The alleged cause of ineffective assistance of counsel has not satisfied the tests of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A due process right to a panel of impartial and indifferent jurors was accorded petitioner in this case. *See Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Inasmuch, there has been shown no prejudice under the circumstances of this case. Petitioner has failed to establish cause and prejudice with respect to the issue of prosecutorial misconduct. The cause of ineffective assistance of counsel as viewed through *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), has not been established. The denial of due process through prosecutor's statements which render a defendant's trial fundamentally unfair is not present in this matter. *See Darden v. Wainwright,* 477 U.S. 187, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Petitioner has failed to demonstrate prejudice. There is no violation of the constitution or the concept of fundamental fairness such as would lead this court to disregard the procedural default regardless of cause and prejudice. *See Murray v. Carrier,* 477 U.S. at ——, 106 S.Ct. at 2649–50, 91 L.Ed.2d at 413. Finally, independent review of these issues leads this court to conclude that there is no violation of a constitutional dimension.

■ 3. Generally, due process requires disclosure of exculpatory evidence. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Applying *United States v. Augenblick,* 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), *Brady v. State of Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the test for finding a due process violation by the loss or destruction of allegedly exculpatory evidence requires a showing of materiality, prejudice and an inquiry into the good faith of the government. A destruction of jurisdictional evidence test would closely parallel the above test. Fundamental notions of fairness require such inquiry. Idaho law, as stated through *State v. Owens,* 101 Idaho 632, 619 P.2d 787 (1980), likewise requires disclosure of exculpatory evidence. *See generally Paradis v. State,* 110 Idaho 534, 716 P.2d 1306 (1986).

■ 4. Petitioner has failed to demonstrate that the items which he alleges were lost, destroyed or undisclosed by the State, namely, the panties, cord, body color pictures and tissue samples, were exculpatory or material to the question of guilt or the degree of punishment. Petitioner has likewise failed to establish prejudice by the loss or destruction of the evidence. Any allegations of bad faith on the part of the State are purely unsupported. To the extent the panties or the cord were lost or destroyed, it was done while in the sole custody, control and possession of the Washington officials. Idaho officials made requests for these items as part of the disclosure in this case. The existence of pictures of the panties and the cord which were disclosed prior to trial could have been employed to raise any inference deemed reasonable. The autopsy of Dr. Brady was complete and adequate and petitioner was not prejudiced by the cremation of the body. There is no support for any allegation that Idaho officials allowed the body to be cremated to destroy any evidence. Idaho Code § 19–4301C requires that the body be released to next of kin not later than twenty-four hours after death or discovery of the body, whichever is later. This was done in good faith.

■ 5. The opinion of Dr. Brady as to the cause of death of Palmer is based upon

scientific evidence reasonably relied upon by experts in his field. *See* Fed.R.Evid 703. Petitioner's attack upon the sufficiency of the Brady autopsy and report on Palmer has failed. At hearing before this court, Brady was asked:

Q. What I would like to ask you, doctor, are you offering your opinion based upon a reasonable medical probability that this woman's lungs were this heavy because she aspirated water?

A. No. My testimony has consistently been that it fits, that it is characteristic of. It is a reasonable explanation, but I have never said that have a reasonable medical certainty that one produced the other. They fit. They go together. I see no problem. They match, ..

Transcript Testimony of William J. Brady, M.D., filed June 3, 1987, at 52. Dr. Roberts was asked whether he felt that Dr. Brady's autopsy report came reasonably close to adequately describing the body for purposes of another pathologist who would want to review the report. To which Roberts responded, "[w]ell, I think there were areas that I didn't understand from the report that were made more—that were actually even brought forward or made clearer by the photographs." Transcript Testimony of Frank A. Roberts, M.D., filed June 3, 1987, at 237. Further, on cross-examination Roberts was asked, "[a]nd you cannot rule out the possibility that Kimberly Palmer was murdered in Idaho and placed facedown in the creek immediately after being strangled?" To which Roberts responded, "[n]o, I cannot." *Id.* at 224. Dr. Lindholm stated that he was familiar with customary standards used in forensic pathology in the conduct of autopsies and the rendering of reports and stated that he had reviewed Dr. Brady's autopsy report with those standards in mind. He stated, "[m]y judgment is, is that it is quite well within those standards and it is a very well put together report. It is a very readable report, and I think that the important issues to be addressed are well documented." Transcript Testimony of George R. Lindholm, M.D., filed June 3, 1987, at 7. This court found Dr. Lindholm to be a very instructive and qualified witness. With respect to all of the opinions and statements rendered by Dr. Brady, this court finds that they were based upon the type of information reasonably relied upon by experts in his field. Dr. Brady's comments were well within the scope of expert testimony. The advisory committee comments as to Rule 702 that, "it will continue to be permissible for the experts to take the further step of suggesting the inferences which should be drawn from applying the specialized knowledge to the facts." Fed. R.Evid. 702 advisory committee's note.

6. In *Jackson v. Commonwealth of Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehr'g denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), the Court stated:

[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.... But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Woodby v. INS*, 385 U.S. [276] at 282, 17 L.Ed.2d 362, 87 S.Ct. 483 [at 486 (1966)] (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id.* at 318–19, 99 S.Ct. at 2788–89 (footnote omitted). This court has no difficulty finding that a rational trier of fact could have found the essential elements of the crime, particularly that Palmer died in Idaho, beyond a reasonable doubt based solely upon what this court has previously described as the non-medical evidence. This court has read every page of the transcript from the proceedings in the State courts. The record evidence clearly could reasonably support a finding of guilt beyond a reasonable doubt. Petitioner's claim regarding

sufficiency of the evidence and the lack of jurisdiction in the State of Idaho is without merit. In the Petition for Writ of Habeas Corpus by a Person in State Custody, June 9, 1986, at pages 4–5, petitioner claims, "[t]he only evidence to support the state's theory and the sole basis for Idaho's jurisdiction over the Palmer murder came from Dr. William Brady, to whom Idaho police had taken the bodies to be autopsied." *See also* Petitioner's Memorandum in Support of Motion for an Evidentiary Hearing and Outlining Law Applicable to Issues to be Raised at Evidentiary Hearing, filed March 6, 1986, at 44. This statement is blatantly false and an attempt to focus this court's attention on the secondary evidence.

7. The right to a fair trial by a panel of impartial indifferent jurors was accorded to the petitioner in this case. *See Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). With respect to the jury that sat in judgment of this case, in all respects it was fundamentally fair. *See Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

8. The claim of petitioner that he was placed in double jeopardy by analogy of the facts of this case to those in *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), is misplaced. Quite simply, the facts in *Ashe* suggest a single robbery transaction with six victims and the facts of this case suggest two separate and distinct murders.

9. The admission of evidence regarding the Currier murder was neither so voluminous or inflammatory as to render its probative value outweighed by its prejudicial value. *See* Fed.R.Evid. 403. The evidence regarding the Currier murder was highly relevant and admissible to show a rational and cohesive scenario, common design, plan or scheme and/or motive. *See Bell v. Arn*, 536 F.2d 123 (6th Cir.1976); *State v. Needs*, 99 Idaho 883, 591 P.2d 130 (1979); 1 J. Warton, *Criminal Evidence* § 241, 243–49 (13th ed. 1972).

10. The admission of the evidence regarding the Currier murder was not admitted nor employed to show the defendant's criminal propensity. The evidence did not force petitioner, acquitted of the Currier murder, to run the gauntlet a second time. *See Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). The doctrine of collateral estoppel as applied in criminal prosecutions, *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), is not applicable to this case as it appears clear from a reading of the transcript of the trial below that issues litigated in the trial of Paradis for the murder of Currier were not relitigated in the trial of Paradis for the murder of Palmer. Petitioner was not placed in double jeopardy in violation of the fifth and fourteenth amendments of the United States constitution, under the principles announced in *Ashe v. Swenson*, by the mere fact that he was brought to trial for the murder of Palmer after having been acquitted of the Currier murder or by the introduction and admission into evidence matters relating to the death of Currier. This is based upon a thorough review of the entire record of the trial in this matter.

11. Under the principles announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), petitioner must show, to support his claim of ineffective assistance of counsel, that counsel's performance was deficient and prejudicial. In order to show deficiency, counsel must be shown to have made errors so serious that he did not function as "counsel" guaranteed by the sixth amendment. Prejudice requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Id.* at 686–87, 104 S.Ct. at 2063–64. While it may be true that under certain circumstances counsel may be so pervasively incompetent that a particularized inquiry is unnecessary, *House v. Balkcom*, 725 F.2d 608 (11th Cir.1984), or that, on the other end of the spectrum, even an isolated error of counsel could be so egregious and prejudicial as to render the entire trial unfair, *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), neither circumstance is presented in this case. Brown's overall representation of petitioner at trial was complete, cohesive, intelligent and very able. Petitioner has failed to show a particularized

claim or an aggregate of particularized claims of ineffective assistance which either show deficiency or prejudice. Brown may have made tactical decisions which petitioner's current counsel would not have, but those decisions made by Brown were conscious and rational. Petitioner's allegation of ineffective assistance of counsel, at all stages of the proceedings below, is wholly without merit, especially in light of the standards set forth in *Strickland.*

■ 12. Petitioner's claim of denial of a jury determination of aggravating circumstances in sentencing is without merit. The Supreme Court in *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), held that the Constitution does not require that a jury have the responsibility of deciding whether or not the death penalty will be imposed. The court stated that the responsibility could be placed on the trial judge to impose the sentence in a capital case. *Id.* at 464, 104 S.Ct. at 3164.

13. The sentencing court is required to consider the character and record of the offender in the circumstances of the specific events. *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The sentencing court must have standards for selecting the offenders who receive the death penalty. *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). The Idaho sentencing procedures meet these requirements. In reviewing a death sentence statute, the court must be assured that all mitigating evidence be considered and weighed. *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The Idaho statute requires that all mitigating factors and all aggravating circumstances be compared.

■ 14. *Gardner v. State of Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), grants to the sentencing judge the right to rely upon information found in the presentence investigation report if the defendant is given the opportunity to review the report and rebut the evidence in that report. Petitioner was given such opportunity in this case. Judge Haman sets forth

the information relied upon in sentencing at Tr. A–480–81. The information relied upon was, in all respects, proper. Petitioner specifically requested that the judge include in his consideration certain statements and evidence. Petitioner cannot now claim that he was denied the right to confront Thomas Gibson regarding the letter presented to Judge Haman after he specifically requested Judge Haman to consider such letter and exculpatory statements made by Gibson in his sentencing determination. Gibson's statements were recognized by all to be exculpatory for Paradis. Petitioner was not denied confrontation even under the narrow rule proscribed in *Proffitt v. Wainwright,* 685 F.2d 1227 (11th Cir.1982).

15. Plaintiff has woefully failed to provide this court with evidence or inference of bias or impartiality on the part of Judge Haman, the sentencing authority. Recognizing that bias or impartiality could taint the proceeding, the court has taken into consideration Judge Haman's actions prior to trial, during trial and during sentencing and given the fact that Judge Haman provided over the Gibson trial and sentencing and the dicta provided by Justice Bistline in *Paradis v. State,* 110 Idaho 534, 716 P.2d 1306 (1986), and finds no actual or potential bias or impartiality.

16. The Idaho Supreme Court, in *State v. Paradis,* 106 Idaho 117, 676 P.2d 31 (1983), stated that it had recently conducted an extensive review of Idaho murder cases and found that the sentence imposed in this case was not disproportionate to the sentence imposed in those cases where the death sentence was available as a form of punishment. *Id.* 106 Idaho at 127, 676 P.2d 31. The court likened this case to that of *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983). The court finds nothing excessive in the sentence imposed in this matter given the facts of the case and similar cases. It should be noted that in the jury instructions, the jury was informed that it must find the acts of the defendant were intended to cause the death of Palmer, that the intent to cause death was willful, deliberate and premeditated. Tr. F–679–80.

The court instructed the jury as to the definitions of malice, willful, premeditation, intent and principal participants to a crime. Tr. F–672–75. Contrary to petitioner's assertion in his petition, that the court's instructions did not require the jury to find that the defendant intended to kill Palmer, the jury was so instructed and necessarily found such to be true beyond a reasonable doubt. The necessary findings in this case are sufficiently explicit. *See Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). The sentence, under the circumstances, was not constitutionally excessive. *See Tison v. Arizona,* 481 U.S. ——, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

17. In *Gregg v. State of Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Court stated that clear standards which guide the discretion of the sentencing body were required. The statutory aggravating circumstance found in Idaho Code § 19–2515(f)(6), that "the defendant exhibited utter disregard for human life," is attacked as vague by the petitioner. The statutory language and the construction set forth in *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), provide constitutionally adequate guidelines to direct the discretion of the sentencing authority. The sentencing court cited the applicable statutory language as well as the *Osborn* case. The court exhibits a good grasp of the language and concepts embodied therein and clearly set forth its findings with reference to the terms and phrases found in the statute and the *Osborn* case. Tr. A–473–94. The Idaho Supreme Court reviewed this argument in *State v. Paradis,* 106 Idaho 117, 676 P.2d 31 (1983).

18. Cumulative prejudice such as to render the trial of this matter fundamentally unfair is neither found in the record below nor through exhibition to this court.

19. In considering the exceptions to the presumption of correctness contained in 28 U.S.C. § 2254, the court makes the following findings and conclusions:

(a) The merits of each and any factual dispute were resolved in the state court hearings.

(b) The fact-finding procedures employed by the state courts were procedurally and substantively adequate to afford a full and fair hearing.

(c) All material facts were adequately developed at the state court.

(d) The state court, as held above, properly exercised jurisdiction over the subject matter and the person of the petitioner in the state court proceeding.

(e) Petitioner was declared indigent by the state courts and was appointed adequate and competent counsel to represent him in this state court proceeding.

(f) The petitioner received full, fair and adequate hearings in the state court proceedings.

(g) There was no denial of due process in the state court proceedings.

(h) Factual issues determined at the state court proceedings are fully and fairly supported by clear and sufficient evidence in the record.

(i) Petitioner has failed to show the existence of one or more of the circumstances respectively set forth in 28 U.S.C. § 2254(d)(1)–(7) and the court has concluded that with respect to the provisions of subparagraph (8), the factual determinations made at the state proceedings are fairly supported and the petitioner has failed to establish by reasonable or convincing evidence that the factual determinations made by the state court were erroneous.

(j) The determination on the merits of the factual issues made after hearing by the state court, in this case of competent jurisdiction, to which the petitioner and the state were parties are sufficiently evidenced by written findings, opinions and/or other reliable and adequate written indicia that this court presumes them correct. *See* Tr. A–H.

20. To the extent necessary and in conjunction with this court's finding, the court will accord the state court determinations a presumption of correctness as defined in 28 U.S.C. § 2254(d).

For the foregoing reasons, the petition for writ of habeas corpus must be denied. Because the court anticipates the petitioner will apply for a certificate of probable cause so that he may appeal all or part of this court's decision, the stay of execution of the sentence of death shall remain in effect for a short period of time to avoid the necessity of petitioning the Ninth Circuit Court of Appeals for an emergency stay.

## V. ORDER

Based upon the foregoing and the court being fully advised in the premises,

IT IS HEREBY ORDERED that the petition for writ of habeas corpus should be, and is hereby, DENIED.

IT IS FURTHER ORDERED that the stay of execution of the sentence of death shall remain in effect to and including August 20, 1987, after which the stay heretofore issued by this court shall thereupon be dissolved.

## APPENDIX I

Of the veniremen examined, several were excused for a variety of reasons. Brian Burrow (would not sit in judgment, Exh. 51, Vol. 1 at 92); Allen Wilhelm (prejudged, Exh. 51, Vol. 1 at 171); JoAnne Hartwig (family, Exh. 51, Vol. 2 at 212); Billie Dilday (nervous condition, Exh. 51, Vol. 2 at 215); Ellen Cantor (business, Exh. 51, Vol. 2 at 230); John Parker (medical, Exh. 51, Vol. 2 at 233); David Bateman (business, Exh. 51, Vol. 2 at 313); Eiko Womble (language barrier, Exh. 51, Vol. 2 at 325); Helen Johnson (married to Kootenai County Deputy Sheriff, Exh. 51, Vol. 3 at 388); Susan Cann (family, Exh. 51, Vol. 3 at 427). Various potential alternates were also excused.

The first venireman examined was Mary Albers. Exh. 51, Vol. 1 at 14. Albers, upon questioning from the prosecutor, indicated that she had read something about the death of Palmer, had not followed the case very closely, had formed no opinion, would listen to all of the evidence, and would base her decision solely on the evidence. *Id.* at 18–19. On questioning from defense attorney Brown, she reiterated that she had heard something of the murder in the press, that it had been a long time prior, and that she had formed no opinion regarding the case. *Id.* at 23–24. Albers was preemptorily challenged by Brown. Exh. 51, Vol. 2 at 310. Albers would have been an acceptable juror.

The second venireman questioned was Marie Whitesel. Exh. 51, Vol. 1 at 33. In response to questioning from the prosecutor, Whitesel indicated that she would listen to all of the evidence, had read about the Gibson case, had not formed an unqualified opinion, would wait for all of the evidence to be presented, maintain an open mind, and that perhaps a medical expert who had actually observed the patient would be more credible than one who simply relied upon the first doctor's report. *Id.* at 37–39. In response to questioning from defense attorney, Whitesel reiterated that she had not formed an opinion, that she had read something about the case in the newspaper, that she would have a hard time believing that a medical professional would do a "shoddy" job, and that someone asserting that a medical professional had performed less than adequately would have to prove it to her. *Id.* at 43–45. Whitesel was preemptorily challenged by Brown. Exh. 51, Vol. 2 at 244. Obviously, the expert upon whom Brown was to rely at trial would receive little credibility from Whitesel.

The next venireman examined was Elizabeth Briesch. Exh. 51, Vol. 1 at 50. Briesch presents the only serious question regarding the impartiality of any particular juror or the jury as a whole. Briesch is a nurse. *Id.* at 50. Briesch indicated that she had read about the case primarily at its inception and had kept up on it through the newspaper, though not extensively. *Id.* at 53. Briesch stated that "I suppose being honest, I would have to say I would probably feel that he probably is guilty." *Id.* However, Briesch indicated that she would wait until all of the evidence was in before she reached a decision as to guilt or innocence. *Id.* at 54. Briesch indicated that she would place some burden on the de-

fendant to prove to her that he was innocent even though the Constitution doesn't place that burden upon the defendant. *Id.* The prosecutor asked the court to excuse Briesch for cause. *Id.*

Upon questioning from the court, Briesch indicated that she did not have in her mind any of the purported facts involved in the case, but just certain hearsay and from what other people had talked about the case. *Id.* Briesch indicated that after review of all of the evidence, she could be more objective, but that she had a feeling that the defendant was guilty. *Id.* at 55. Briesch affirmatively stated that she could set aside any such feelings and decide the case solely on the evidence presented. *Id.* Briesch indicated to the court that she would follow his instructions. *Id.* The challenge for cause was denied. *Id.*

Upon questioning from defense counsel, Briesch was asked to define what she thought "presumption of innocence" was and she stated, "[t]o me somebody should be considered innocent until you have concrete evidence to prove that they are guilty of a particular crime." *Id.* at 57. The defense posed the hypothetical that the State put on its case and the defendant neither lifted a finger nor said a word and asked Briesch whether, if she had some reasonable doubt, it would bother her conscience to vote not guilty, and she replied, "[n]o, if I thought that there was a reasonable doubt, I certainly could not go along with sentencing somebody, if there was a possibility that they were, you know, innocent." *Id.* Briesch indicated that it would not matter to her if the defendant testified. *Id.* at 58.

Defense counsel asked Briesch if it would bother her if two physicians, both eminently qualified, had a head-to-head clash with their respective opinions. Briesch answered that it would not. *Id.* Briesch offered that doctors "always dicker." *Id.* Briesch indicated that it would bother her if one physician did not do a thorough job. *Id.* at 59. Briesch also indicated that the police should do everything they were supposed to do under the gener-

al rules of investigation. *Id.* Finally, Briesch indicated that it would probably take some evidence from the defendant. *Id.* at 60.

In his petition for writ of habeas corpus, petitioner alleges that Brown provided ineffective assistance of counsel in failing to challenge for cause one juror (Briesch) who said that she had followed the case, believed that petitioner was probably guilty, and would require petitioner to put on evidence to prove that he was innocent. Petition for Writ of Habeas Corpus by a Person in State Custody, filed June 9, 1986, at 19. Briesch indicated to the court that she did not have an express or unqualified opinion, but more of a general feeling that the defendant was guilty. This she gathered from the media and listening to others speak in reference to the case. Briesch stated unequivocally, however, that she thought she could set aside such feelings and decide the case solely on the evidence presented. Briesch gave as adequate a definition of the presumption of innocence as could be expressed. Briesch indicated a familiarity and understanding of the reasonable doubt standard. Briesch stated that she was willing to follow the instructions of the court. The court instructed the jury that it would be a violation of their duty to base a verdict of guilty upon anything other than the evidence in the case. Tr. F–678. The court instructed the jury that a defendant cannot be compelled to testify. Tr. F–678. The jury was instructed that each element had to be found beyond a reasonable doubt. Tr. F–680. In the instructions given prior to trial, the court told the jury that the preliminary instructions and the final instructions were to be considered together and would be submitted for consideration in the jury room. Tr. B–8. The court instructed the jury that the law presumes every person to be innocent. Tr. B–9. The court outlined the reasonable doubt standard. Tr. B–9–10. Finally, the court instructed the jury that it could not consider any information received outside of court. Tr. B–15.

Judge Haman and defense counsel were obviously satisfied by the answers and demeanor of Briesch that she would lay aside

any preconceived notions and follow the instructions of the court. The court's instructions clearly put the onus of conviction upon the prosecution. Briesch, from the record, appears to be a reasonable person who answered the questions of court and counsel with candor, honesty and sincerity. Any failings as a prospective juror were rehabilitated by her willingness to set aside any preconceived notions and follow the instructions of the court.

As noted, Briesch is a nurse and her husband a physician. Briesch told defense counsel that doctors often dicker and that she would, in effect, hold it against a doctor who was shown to have performed his tasks insufficiently. This is a major element of defendant's case. The defense, throughout trial, attempted to prove that Dr. Brady's autopsy and conclusions were insufficient and unfounded and that Dr. Larson, an eminently qualified pathologist, held the correct opinions and could point out the deficiencies in Dr. Brady's work. Obviously, if the defense had been successful in showing Dr. Brady's work and opinions to be inadequate, Briesch, as indicated by her answers, would have given little weight to Dr. Brady's testimony. While the court does not know the thought processes of defense counsel at the time, it does appear that Briesch answered the questions of counsel regarding conflicting medical expert testimony more favorably for the defendant than any other juror so questioned on the matter. This indicates to the court a tactical decision by counsel. Further, it appears that Mr. Paradis was assisting Mr. Brown in determining which prospective jurors to preemptorily challenge. Exh. 51, Vol. 2 at 271.

The next venireman examined was K. Patricia Ammerman. Exh. 51, Vol. 1 at 61. Ammerman informed the parties that she had read nothing about the case. *Id.* at 63. Upon questioning by the prosecution, Ammerman indicated that she would base her verdict solely on the evidence presented at trial. *Id.* at 64. In response to questioning from defense counsel, Ammerman indicated that she would not necessarily believe a police officer more than someone else who was testifying and that she would

have no problem voting not guilty if she had a reasonable doubt. *Id.* at 66–67. Ammerman, without question, is a perfect juror.

The next venireman examined was Doris Widmyer. Exh. 51, Vol. 1 at 69. Widmyer answered questions from the prosecution and stated that she would be fair and impartial, would listen to all of the evidence before reaching a decision, had read the name in the paper, but had no idea of the facts of the case, had formed no opinion and had an open mind. *Id.* at 71–72. In response to questions by defense counsel, Widmyer indicated that at the time of questioning Paradis was not guilty until proven guilty, that it would not bother her if the defendant did not testify, that it did not matter that Paradis belonged to a motorcycle club, and that she herself rode motorcycles. *Id.* at 74–75. Widmyer would be an outstanding juror. The State preemptorily challenged Widmyer. Exh. 51, Vol. 2 at 343.

Marion Ridge was the next venireman questioned. Exh. 51, Vol. 1 at 77. Ridge indicated that he had not read anything about the case in the newspaper, would be fair and impartial, and would have to be sure of guilt. *Id.* at 78–79. In response to questions from defense counsel, he indicated that he had seen something about the case on television or heard it on the radio. *Id.* at 82. Ridge appeared to have no preconceived notions about the case and had no problems with people belonging to motorcycle clubs. *Id.* at 82–84. Ridge was fully qualified to sit as a juror in this matter. The State preemptorily challenged Ridge. Exh. 52, Vol. 2 at 259.

The next venireman not excused for cause was Ralph Willis, Jr. Exh. 51, Vol. 1 at 93. Upon questioning from the prosecution, Willis indicated that he had a brother who was a police officer, but that he did not feel police officers were necessarily more truthful than other people. *Id.* at 95–96. Willis indicated that he considered himself fair and impartial, would base his decision solely on the evidence presented at trial, and that he had no particular problems or feelings with respect to bikers or

motorcycle groups. *Id.* at 96–97. Willis indicated that he had read something about the case, but that it had been a long time in the past and that he didn't remember "a heck of a lot about it." *Id.* at 97. Willis adequately defined the presumption of innocence. *Id.* at 101. Willis also indicated that if he had doubts he would vote not guilty. *Id.* at 102. He stated that he had formed no opinion regarding the case. *Id.* at 103. Willis would have been an excellent juror. Brown preemptorily challenged Willis. Exh. 51, Vol. 2 at 210.

The next venireman examined was Arthur Kinley. Exh. 51, Vol. 1 at 107. Kinley indicated that he would be fair and impartial and listen to all of the evidence before making up his mind. *Id.* at 111. Kinley stated that he had heard of the case through the media, but that he had formed no opinion regarding guilt or innocence. *Id.* at 112–13. Kinley indicated confusion regarding the burden of proof and was challenged for cause by the defense. The challenge was denied. *Id.* at 117. Kinley indicated that he had no particular problems with motorcycle clubs. *Id.* at 118. The motion for challenge for cause was renewed by Brown. *Id.* at 122. Kinley exhibited confusion regarding the necessity of the State proving each element of the offense beyond a reasonable doubt. *Id.* at 123. The renewed motion for challenge for cause was denied. *Id.* at 124. While Kinley may not have been the best prospective juror, it had nothing to do with his exposure to the case through the media. The State preemptorily challenged Kinley. Exh. 51, Vol. 2 at 197.

Leota Bailey was next questioned by counsel. Exh. 51, Vol. 1 at 125. Bailey indicated that she had read about this case each time there had been something about it in the newspaper. *Id.* at 128. Bailey indicated that she had not completely formed any opinion as to guilt or innocence, that she would listen to all of the facts presented at trial before determining guilt, and that she would keep an open mind. *Id.* at 128. Upon questioning from defense counsel, Bailey indicated that she had discussed the matter with her husband, but she didn't particularly agree with her hus-

band's opinion. Bailey indicated that she would need all of the facts, but that she thought that perhaps Paradis was an accessory. *Id.* at 136–37. Bailey indicated that she had no particular problem with motorcycle club members, and that she would be bound by the instructions of the judge. *Id.* at 140. While Bailey's exposure to the case through the media was more extensive than some others, she indicated that she had not formed an express opinion and at one point offered that more facts would be necessary before she would make a decision. While Bailey was preemptorily challenged by Brown (Exh. 51, Vol. 2 at 271) her presence on the jury would not have called into question the impartiality of such jury.

Carolyn Williams was next to be called for examination. Exh. 51, Vol. 1 at 142. Williams stated that she had read about the case in the newspaper, but that she had not followed it too closely. *Id.* at 146. She stated that her reading was "about a year ago." *Id.* Williams said that she didn't know all the facts that were involved, nor would she base her decision upon what she had read in the newspaper. *Id.* Further, she stated that she would wait until the evidence was presented, had no opinion as to guilt and would keep an open mind. *Id.* Williams stated that she would abide by the judge's instructions and that she had no contact with motorcycle club members. *Id.* at 151. Williams' exposure to the media regarding this case was passing and at a distant time. Williams would have been a very adequate juror. Brown preemptorily challenged Williams. Exh. 51, Vol. 2 at 289.

Mike Djokich was the next venireman called for examination. Exh. 51, Vol. 1 at 153. Djokich indicated that he understood that it was the State's responsibility to prove guilt and that the defendant was considered innocent until such time. *Id.* at 154. He indicated that he hadn't read anything about the case and did not have the slightest idea regarding defendant's guilt or innocence at that point. *Id.* at 155. Djokich would have been a very qualified

juror. The State preemptorily challenged Djokich. Exh. 51, Vol. 2 at 300.

The next venireman not challenged for cause was Bonnie Willette. Exh. 51, Vol. 1 at 172. Willette indicated that she understood that the defendant was presumed innocent until the State proved him guilty. *Id.* at 176. Willette indicated that she had not read anything about the case nor heard anything on television or radio. *Id.* at 178. She indicated that her only exposure was through people who came into her place of business and commented upon the case. *Id.* Willette stated that she had never expressed an opinion, had an open mind, and would be fair and impartial. *Id.* at 178–79. Willette indicated that she would follow the instructions of the judge. *Id.* at 183. Willette would have made a very good juror. Willette was preemptorily challenged by Brown. Exh. 51, Vol. 2 at 335.

The next venireman examined was Doug McCray. Exh. 51, Vol. 2 at 198. McCray indicated that he had read something about the case, but had not followed it closely. *Id.* at 200. He indicated that he had heard about it only in connection with the Gibson trial on television. Again, he had not followed it closely. *Id.* When asked whether he had formed an unqualified opinion as to the matter, McCray stated "[n]o, no opinion at all." *Id.* McCray indicated that he would base his decision solely upon the evidence heard at trial and not on anything that he brought into court. *Id.* at 200–201. McCray, upon questions from defense counsel, indicated that it would not bother him if the defendant belonged to a motorcycle club, that he understood the presumption of innocence as being a constitutional right, and that he would follow the judge's instruction regarding reasonable doubt. *Id.* at 208–09. McCray would have been an exemplary juror. The State preemptorily challenged McCray. Exh. 51, Vol. 2 at 228.

The next venireman called and not excused for cause was John DeSelle. Exh. 51, Vol. 2 at 216. DeSelle indicated that he had met the prosecutor before at a Kiwanis meeting. *Id.* at 216. DeSelle indicated that he had not gone out of his way to follow the case in the media, but had read about it in the papers. *Id.* at 220. When asked whether he would base his decision regarding guilt solely upon what he had read in the newspaper, DeSelle indicated that he would not base it on that at all. *Id.* DeSelle stated that he would keep an open mind and only reach a decision after listening to all of the evidence presented at trial. *Id.* DeSelle was asked whether what he had read would make it more likely in his mind that Paradis had committed the crime, to which he responded:

> I would hope not, and I don't think so. It's my understanding that in a court of law the duty of the jury is to decide or reach a verdict based on the facts presented in the courtroom without regard to anything that has happened prior to that time. I would attempt to do that, and I think I can do that.

*Id.* at 225. DeSelle stated that the fact that Paradis was connected with a motorcycle club did not bother him, nor was he bothered by the prospect of Paradis not taking the stand in his own defense. *Id.* at 226. DeSelle exhibited no preconceived notions of guilt, no extensive exposure of the case through the media, and absolutely no indication of bias.

The next venireman not excused for cause was Becky Baeth. Exh. 51, Vol. 2 at 234. Baeth stated that she had read something about the case when the underlying events were first revealed, but that it was not fresh in her mind. *Id.* at 236. She stated that she had formed no opinion, would listen to all of the evidence before forming an opinion, that the State had the responsibility of proof beyond a reasonable doubt, and that she would follow the judge's instructions. *Id.* at 236–39. Upon questioning from the defense counsel, Baeth stated that it did not matter to her which party put up the most witnesses, whether some of the witnesses were police officers, that she had not formed an opinion regarding guilt, that she believed in the presumption of innocence, and that she had had no real exposure to individuals in motorcycle clubs. *Id.* at 240–43. Baeth appears from the record to be intelligent, honest and without any preconceived notions regarding this case, a perfect juror.

The next venireman examined during voir dire was Russell Wiemers. Exh. 51, Vol. 2 at 245. Wiemers stated that he would be a fair and impartial juror "especially in this case" because he had no knowledge of it. *Id.* at 246–47. Wiemers stated that sympathy didn't play a role in the decision-making. *Id.* at 248. Wiemers stated that everyone was considered innocent until proven guilty and that the State had the burden of proving guilt. *Id.* at 249. He stated that he would follow the judge's instructions. *Id.* at 250. He stated that it would not bother him if Paradis did not testify. *Id.* at 256. Wiemers stated that he would abide by the court's instructions unless they violated his conscience. *Id.* at 257–58. Brown challenged for cause regarding the statement. *Id.* at 258. The challenge was denied on the grounds that the whole line of questioning was requiring a great deal of speculation. *Id.* at 258. Wiemers clearly understood the presumption of innocence, the concept of reasonable doubt and upon whose shoulders rested the burden of proof. He had no preconceived notions regarding the case, nor had he been inundated by media exposure. Brown's challenge for cause was unfounded and based upon a very speculative statement made by Wiemers. From the record it appears that Wiemers was an entirely fair and impartial and reasonable person.

Danny Young was the next venireman brought in for examination. Exh. 51, Vol. 2 at 260. Young indicated that he had heard from other people regarding the initial finding of the bodies and that the only media exposure was about a week prior he had seen an article regarding request to transfer the case on change of venue. *Id.* at 262. Young indicated that he had formed no opinion whatsoever. *Id.* Young stated that he felt he was a reasonable person and would keep an open mind until all of the evidence was presented. *Id.* Young stated that he understood that the State was required to prove the defendant guilty, would require the State so to do, and beyond a reasonable doubt. *Id.* at 263–64. Upon questioning from defense counsel, Young stated that he would not tend to believe police officers more than other witnesses. *Id.* at 267. Young stated that he owned a motorcycle and the fact that Paradis belonged to a motorcycle club did not bother him. *Id.* Young stated that if he had to vote guilty or not guilty at the particular moment, he would vote not guilty. *Id.* at 268. Upon reopened questioning from the prosecution, Young stated that if two pathologists differed in an opinion, a third opinion should be obtained, and if two pathologists differed in medical conclusions, he would have to go with the person who actually did the autopsy. *Id.* at 270. Young was not further questioned regarding medical opinions by Brown. Young exhibited all the qualities of a fair, impartial and reasonable person. Although his statement regarding adopting the position of the individual who actually did an autopsy over another medical professional with a different opinion was not further explored by Brown, there is no indication that this statement was ironclad nor that the statement even remotely outweighed the other positive qualities exhibited by Young.

Eugene Carter was next called for examination. Exh. 51, Vol. 2 at 272. Carter stated that he had read about the case in the newspaper, but that it was "just another article I read, and I went on to the next one." *Id.* at 274. When asked whether he had a hard and fast opinion regarding guilt or lack of guilt, Carter answered, "[n]o. The only feelings I have, the man is innocent until he's proven guilty." *Id.* at 274. Carter stated to defense counsel that he would not believe a police office on the witness stand any more than anyone else, that he had had no contact with or animus toward motorcycle clubs, that if he had a reasonable doubt he would vote not guilty, and that it would not bother him if the defendant did not take the stand. *Id.* at 278–80. Carter's exposure to the case through the media was neither saturating nor created predisposition. Carter would have been an acceptable juror. The State preemptorily challenged Carter. Exh. 51, Vol. 3 at 397.

Christine Wickersham was next called for examination. Exh. 51, Vol. 2 at 290.

Wickersham stated that she had never read about the case. *Id.* at 292. Wickersham stated that the fact that Paradis belonged to a motorcycle club would not bother her. *Id.* at 296. She stated that if there was any doubt at all, she could not vote guilty. *Id.* at 298. It appears from the record that Wickersham embodied the perfect juror to sit in judgment of this case.

Simmie DeMarre was next called for voir dire examination. Exh. 51, Vol. 2 at 301. DeMarre stated that he had heard and read about the case, but had not followed it too closely nor formed any opinions. *Id.* at 302. He stated that he came in with an open mind and would listen to all of the evidence before coming to a conclusion. *Id.* at 302–03. DeMarre stated that it would not bother him if Paradis were in a motorcycle club. *Id.* at 308. DeMarre stated that he would follow the instructions of the judge. *Id.* at 310. DeMarre's answers to questions propounded by counsel show no evidence of media saturation, general predisposition in the community, nor personal predisposition regarding this case. DeMarre would have been an adequate juror. He was preemptorily challenged by Brown. Exh. 51, Vol. 2 at 350.

The court next called Sharon Gabourie for examination. Exh. 51, Vol. 2 at 314. Gabourie is married to a practicing defense attorney who had expressed his opinion to her. *Id.* at 314–16. Gabourie stated that she had read the headlines in the newspaper, but didn't read many of the articles in detail. *Id.* at 316. She stated that she would probably side with a doctor who had actually seen a patient as opposed to one who had merely reviewed records. *Id.* at 318. However, Gabourie stated that she would have more respect for the second physician's opinion if the first were shown to have failed in following accepted methodology. *Id.* at 321. Gabourie exhibited no predisposition toward this case and no excessive exposure to media reports. Gabourie was preemptorily challenged by the State. Exh. 51, Vol. 2 at 323.

Pamela Hart was next examined during the voir dire procedure. Exh. 51, Vol. 2 at 326. Hart stated that she had read about the case, but had not followed it closely and only off and on. *Id.* at 327. Hart indicated that she had an open mind, had no preconceived opinion and would base her decision solely upon the evidence. *Id.* at 328. Hart stated that it would not bother her that defendant was a member of a motorcycle club and that it would not bother her if the defendant did not testify. *Id.* at 333–34. Hart showed no preconceived notions, no evidence that the general community was saturated with the case by the media, and would have made an excellent juror. Hart was preemptorily challenged by Brown. Exh. 51, Vol. 3 at 386.

Leland Bertz was called for examination. Exh. 51, Vol. 2 at 336. Bertz stated that he had heard about the case only at the time of the underlying events from the newspaper. *Id.* at 337. Bertz stated that he had no opinion in the matter and would base his decision solely upon the evidence. *Id.* at 337. Bertz understood the concepts of reasonable doubt and presumption of innocence. *Id.* at 342. Bertz had no preconceived notions regarding this matter and was clearly a constitutionally acceptable juror.

Alfred Nugent, next called for examination, stated that he had read very little about the case and that he did not read that part of the paper. *Id.* at 343–46. Nugent maintained a good grasp of the concept of the presumption of innocence. *Id.* at 349. Nugent commented, upon questioning from the prosecution, that a person who had first-hand observance would probably be in a better position to offer an opinion and that there was often slippage in second-hand information. *Id.* at 348. He was not questioned regarding this statement by Brown. However, he did not state that this was a hard and fast position and it appears that he was relying upon his expertise in his personal field. There is absolutely no indication that this statement would cause, in the context of this case, Nugent to adopt the position of Dr. Brady over Dr. Larson. Again, Nugent presents no evidence of media saturation of the community.

Jack Bowman, upon examination, stated that he had read some about the case, but hadn't followed it very closely. *Id.* at 351–53. He stated that he had no opinion regarding the case and would base his decision solely upon the evidence. *Id.* at 353. Bowman stated that he would follow the judge's instructions in the case. *Id.* at 359. Bowman's exposure to the case through the media was minimal and created no predisposition in his mind. Bowman would have made a more than adequate juror. Bowman was preemptorily challenged by the State. Exh. 51, Vol. 2 at 360.

Barbara Hoffman was next called for examination. Exh. 51, Vol. 3 at 370. Hoffman indicated that she had no preconceived ideas and wasn't sure what case was being discussed in reference to whether or not she had read about it in the media. *Id.* at 374. Hoffman indicated that the burden of proof was on the State and that she would view her decision solely on the basis of the evidence produced. *Id.* at 375. Hoffman stated to defense counsel that she would probably believe an officer over a lay person who was testifying. *Id.* at 381. Hoffman stated that it would bother her if the defendant did not testify. *Id.* at 383. Hoffman stated that it would not bother her that Paradis was a member of a motorcycle club. *Id.* at 385. Hoffman would have made an acceptable juror, but was preemptorily challenged by Brown. Exh. 51, Vol. 3 at 409.

Voir dire continued with Delbert Hildreth. Exh. 51, Vol. 3 at 390. Hildreth stated that he and the prosecutor were members of the same religious congregation, but that it would not make him partial toward the State or against the State in the case. *Id.* Hildreth stated that he could give the defendant a fair trial and would listen to all of the evidence before making a decision. *Id.* at 390–91. Hildreth stated that he had read some about the case, but it was not the kind of news that he followed closely. *Id.* at 391–92. Upon questioning from defense counsel, Hildreth stated that he had known the prosecutor for approximately three years as the bishop in his church, but that it would not be a burden upon him to vote against the prose-cutor's position, if necessary. *Id.* at 393–94. Hildreth stated that it would not bother him that Paradis was a member of a motorcycle club. *Id.* at 396. In his petition for writ of habeas corpus, petitioner alleges that Brown's representation during voir dire showed ineffective assistance of counsel in that he failed to challenge for cause a juror (Hildreth) who is a member of the Mormon congregation in which the prosecutor was a bishop. Hildreth clearly satisfied defense counsel, as well as the court, that he had no predisposition, no media saturation, and would not allow his acquaintanceship with the prosecutor to sway his decision. Hildreth was a more than constitutionally adequate juror to sit in this case.

Joseph Leigh was next examined during voir dire. Exh. 51, Vol. 3 at 398. Leigh indicated that he had read something about the case when it first happened, but had not followed the recent articles in the newspaper. *Id.* at 402. Leigh indicated that he had no opinion of guilt or innocence and would base his decision upon the evidence in the courtroom. *Id.* Leigh stated that it would not bother him that Paradis belonged to a motorcycle club. *Id.* at 406. Leigh stated that he would vote not guilty if confronted with a reasonable doubt. *Id.* at 408. Leigh would have been a fair and impartial juror to sit in this matter. Leigh was preemptorily challenged by Brown. Exh. 51, Vol. 3 at 423.

The next venireman to be examined was Roger Day. Exh. 51, Vol. 3 at 410. Day indicated that he had read a couple of items in the newspaper about the upcoming trial, but had paid no particular attention to it and had not followed the companion case. *Id.* at 414. Day stated that he came in with an open mind and would place the burden of proof beyond a reasonable doubt upon the State. *Id.* at 415. Day stated that he would carefully weigh the evidence regarding conflicting medical testimony. *Id.* at 418. Day had not seen or heard anything regarding the case on television or on the radio. *Id.* at 420. Day stated that it would not bother him that Paradis belonged to a motorcycle club. *Id.* at 421.

**1404**

Day was not predisposed regarding this matter, showed no evidence of media saturation of the community and composed the qualities of an excellent juror.

Finally, the last venireman examined who was not challenged for cause was Becky Mullen. Exh. 51, Vol. 3 at 428. Mullen stated that she realized that the burden of proof was upon the State to prove the defendant guilty. *Id.* at 430. Mullen stated that she had only read that the defendant had been charged with a crime and not much more. *Id.* at 431. Mullen stated that she had an open mind, would not base her decision upon anything she had read or heard and would base it solely upon the evidence presented in court. *Id.* at 432. Mullen stated that it would not bother her that Paradis belonged to a motorcycle club. *Id.* at 436. Mullen exhibited all of the qualities of a fair and impartial juror and none of the qualities of a juror from a community saturated with publicity regarding a particular matter.